**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:
Marilyn Kelly           Michael F. Cavanagh
                        Elizabeth A. Weaver
                        Maura D. Corrigan
                        Robert P. Young, Jr.
                        Stephen J. Markman
                        Diane M. Hathaway

FILED JULY 31, 2009

In re Honorable STEVEN R. SERVAAS
Judge, 63rd District Court.

No. 137633

BEFORE THE ENTIRE BENCH

WEAVER, J.

The Judicial Tenure Commission (JTC) recommended that this Court remove 63rd District Court Judge Steven Servaas (respondent) from office for vacating his office, as well as for judicial misconduct involving a comment and two drawings of a sexual nature. Because we conclude that the only appropriate forum to determine whether respondent vacated his judicial office is a quo warranto action filed by the Attorney General in the Court of Appeals, we reject the JTC's recommendation as to the vacation of office claim. Respondent's conduct concerning the comment and two drawings was unquestionably inappropriate; however, a majority of this Court concludes that respondent's conduct did not rise to the level of blatant judicial misconduct requiring the most severe sanction: removal from office. In this respect, we view respondent's

actions as an aberration given his 35 years of apparent unblemished service as Judge of the 63rd District Court. Accordingly we impose public censure only.

I

Respondent is a judge of the 63rd District Court, 1st Division, in Rockford, Michigan. On February 14, 2008, the JTC filed Formal Complaint No 84,[1] alleging that respondent had committed judicial misconduct in violation of Const 1963, art 6, § 20;[2] MCR 9.104[3] and MCR 9.205;[4] and the Michigan Code of

---

[1] On both January 17, 2008, and February 14, 2008, the JTC filed petitions for interim suspension without pay pending final resolution of this matter. Both petitions were denied by this Court.

[2] See note 8 of this opinion.

[3] MCR 9.104 states in part:
        (A)    The following acts or omissions by an attorney, individually or in concert with another person, are misconduct and grounds for discipline, whether or not occurring in the course of an attorney-client relationship:

        (1) conduct prejudicial to the proper administration of justice;
        (2) conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach;
        (3) conduct that is contrary to justice, ethics, honesty, or good morals;
        (4) conduct that violates the standards or rules of professional responsibility adopted by the Supreme Court

[4] MCR 9.205 states in part:

        (A) Responsibility of Judge. A judge is personally responsible for the judge's own behavior and for the proper conduct and administration of the court in which the judge presides.

        (B)    Grounds for Action.    A judge is subject to censure, suspension with or without pay, retirement, or removal for . . .

2

Judicial Conduct (MCJC), Canons 1,[5] 2A-C,[6] and 3A(3).[7]

---

misconduct in office . . . or conduct that is clearly prejudicial to the administration of justice. . . .

(1) Misconduct in office includes, but is not limited to:

* * *

(c) persistent failure to treat persons fairly and courteously;
(d) treatment of a person unfairly or discourteously because of the person's race, gender, or other protected personal characteristic[.]

[5] Canon 1 of the Code of Judicial Conduct states in part:

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary. . . .

[6] Canon 2 of the Code of Judicial Conduct states in part:

A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. . . .

B. A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary. Without regard to a person's race, gender, or other protected personal characteristic, a judge should treat every person fairly, with courtesy and respect.

C. A judge should not allow family, social, or other relationships to influence judicial conduct or judgment. A judge should not use the prestige of office to advance personal business interests or those of others. . . .

[7] Canon 3(A)(3) Code of Judicial Conduct provides:

Specifically, the first count of the complaint alleged that respondent vacated his judicial office in violation of Const 1963, art 6, § 20,[8] when he changed his primary residence from Cannon Township, which is located in the 1st division of the 63rd District Court, to Ada Township, which is located in the 2nd division of the same judicial district.[9] The second count of the complaint alleged that

A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control.

[8] Const 1963, art 6, § 20, provides that "[w]henever a justice or judge removes his domicile beyond the limits of the territory from which he was elected or appointed, he shall have vacated his office."

[9] Justice Markman's argument conflates the complaint of vacation of office with the other complaints concerning inappropriate sexual conduct. In doing so, he asserts that it is perfectly appropriate for the JTC to bring an action asserting vacation of office, along with any other assertions concerning disciplinary conduct. A study of Const 1963, art 6, § 30(1), and MCR 9.205(B) contradicts this argument. Specifically, the JTC's authority is limited to bringing actions against a judge

for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. [Const 1963, art 6, § 30(1).]

The JTC has no authority to complain that a judge has vacated his office.

An *allegation of vacation of office* is distinct from the JTC's authority to recommend to this Court that a judge be *censured by removal* from office. Further, Justice Markman asserts, without citing any authority, that it is perfectly appropriate for a quo warranto complaint to be combined with complaints for *judicial misconduct*. To the contrary, pursuant to MCR 3.306(A)(1), an action for quo warranto "must be brought in the Court of Appeals." MCR 3.306 says nothing about whether the JTC has *any* legal authority to bring a complaint of quo

4

respondent failed to comply with statutory notification requirements when he failed to change his driver's license information and voter registration to reflect his move to Ada Township.

The third count of the complaint alleged that respondent engaged in sexually inappropriate conduct directed toward female court employees, citing three specific examples. In the first instance, it was alleged that respondent drew female breasts on a note that was attached to a court file. The drawing was made after a female clerk commented on the revealing dress of a woman who appeared in court. The second event concerned the drawing of a penis that appeared on a note attached to a court file. The third instance occurred during a retirement party for an employee at the 2nd division courthouse. While at the party, respondent commented on a university sweatshirt worn by a female clerk employed in the 2nd division. Respondent stated that the woman had "an awfully small chest" for the college indicated on the sweatshirt, and "should have gone to a smaller school like Alma," which would have fit her "small chest better."

On March 5, 2008, this Court appointed the Honorable Casper O. Grathwohl as master to hear the case. The master's report, issued on May 12, 2008, concluded that respondent vacated his judicial office in violation of Const 1963, art 6, § 20, when he changed his principal residence from the 1st division to

warranto and a complaint of judicial misconduct in a JTC proceeding. An allegation of quo warranto is not magically converted into another kind of judicial misconduct simply by linking the allegation to actual judicial misconduct complaints.

the 2nd division of the 63rd District Court in August 2005. The master recommended that the second count of the complaint be dismissed.[10] The master further concluded that respondent's "sexual doodles and sexual communication" constituted judicial misconduct and compromised the integrity of the court.

Respondent filed objections to the master's report. The JTC issued its decision and recommendation for an order of discipline on October 17, 2008. The JTC adopted the master's findings of fact and conclusions of law, with the exception of finding that respondent had moved to the 2nd division "as early" as 2000. In making this factual finding, the JTC relied on documentary evidence that was offered solely for impeachment purposes in the proceedings before the master, but was not substantively admitted.[11] On the basis of the findings of fact and conclusions of law, the JTC recommended that respondent be removed from office. The JTC further recommended that respondent be assessed fees and costs in the amount of $8,364.38 because respondent "engaged in deceit and intentional misrepresentation."

---

[10] The examiner did not file any objections to the master's report, as required by MCR 9.215. Despite the apparent forfeiture of the issue, however, the JTC "agree[d] with and adopt[ed]" the master's conclusions regarding count II. In light of the forfeiture of the issue, it will not be further discussed in this opinion.

[11] The examiner indicated that he did "not intend to offer" the documents into evidence because he had not provided respondent with copies of the exhibits as required by both the pretrial order and MCR 9.208(C)(1)(a)(i).

II

This Court reviews the recommendations and findings of the JTC de novo.[12] The standard of proof in judicial disciplinary proceedings is a preponderance of the evidence.[13]

A. Vacation of Office

Const 1963, art 6, § 20, provides that "[w]henever a justice or judge removes his domicile beyond the limits of the territory from which he was elected or appointed, he shall have vacated his office." The parties agree that the term "domicile" refers to respondent's primary residence. Furthermore, respondent *admits* that he changed his primary residence to the 2nd election division from 2005 to 2008.[14] The dispute centers on the meaning of the word "territory." Respondent argues that "territory" refers to the entire 63rd judicial district, while the JTC argues that the term is limited to the election division within the district. Thus, when respondent moved his primary residence from the 1st election division to the 2nd election division of the 63rd District Court, the JTC maintains that respondent vacated his office, possessed no authority to continue to serve as a judge, and functioned as a "nonjudge masquerading as a judge."

---

[12] MCR 9.225; *In re Somers*, 384 Mich 320, 323; 182 NW2d 341 (1971).

[13] *In re Loyd*, 424 Mich 514; 384 NW2d 9 (1986).

[14] Although the JTC found that respondent moved from the first election division to the second election division in 2000 rather than 2005, in light of respondent's admissions, that finding adds no weight to the allegations that respondent vacated his office.

7

However, this Court need not address which argument is correct, nor reach a conclusion regarding whether respondent vacated his office because our statutes, caselaw, and court rules provide that a quo warranto action brought by the Attorney General in the Court of Appeals *is the only appropriate and exclusive proceeding to make the preliminary determination regarding whether respondent vacated or unlawfully held his judicial office.*[15]

MCL 600.4501 provides that the Attorney General shall bring an action for quo warranto "when the facts clearly warrant the bringing of the action."[16]  MCR 3.306(A)(1) provides that the quo warranto action *must* be brought in the Court of

---

[15] Justice Markman, *post* at 11, asserts that another reason that the JTC, and not the Court of Appeals, can bring a vacation of office complaint is that the quo warranto statute, MCL 600.4505, implies that actions for quo warranto may only be brought for "claims that an officer is *currently* exercising an invalid title to office."  At the time the JTC brought its complaint for vacation of office against the respondent, respondent *was currently* in office.  There is no support for this argument in MCL 600.4505, and *In re Kapcia,* 389 Mich 306; 205 NW2d 436 (1973), does not support this assertion.  Rather, the Court in *Kapcia* declared that its opinion did not consider whether a quo warranto action by the Court of Appeals was required for a judge who had lost his license to thereafter determine whether the judge had vacated his office.  Wisely, that Court recognized the Court of Appeals initial exclusive jurisdiction with respect to quo warranto proceedings.  Justice Markman, *post* at 17 n 16, asserts that *Kapcia* establishes that the JTC cannot use any other entity's findings, including those of the Court of Appeals.  Again, with respect to a quo warranto proceeding, the JTC *has no authority to make a finding* that a judge improperly vacated his office.  The JTC only has the authority to recommend what disciplinary measure should be exercised by this Court based on the exclusive right of the Court of Appeals to make the determination in a quo warranto proceeding.

[16] If the Attorney General refuses to act, a private party may bring the action upon leave of court. MCL 600.4501.

8

Appeals when a person "usurps, intrudes into, or unlawfully holds or exercises a state office," or if a state officer "does or suffers an act that by law works a forfeiture of the office." If a quo warranto action claims usurpation of office, the judgment "may determine the right of the defendant to hold the office."[17] Moreover, if a defendant in a quo warranto proceeding is found to unlawfully hold or exercise the office at issue, the defendant may be assessed fines[18] and damages[19] in addition to being ousted from office. Significantly, our caselaw has held for more than a century that "[t]he *only way* to try titles to office finally and conclusively is by *quo warranto.*"[20]

Notwithstanding, the JTC asks this Court to make the prefatory determination that respondent vacated his office under Const 1963, art 6, § 20, and that he consequently "was no longer a judge" and acted "without judicial authority," as a basis of removing respondent from office for judicial misconduct.

---

[17] MCL 600.4505(1).

[18] MCL 600.4515.

[19] MCL 600.4511.

[20] *Frey v Michie*, 68 Mich 323, 327; 36 NW 184 (1888) (emphasis added). See also *Metevier v Therrien,* 80 Mich 187, 45 NW 78 (1890); *People v Kongeal,* 212 Mich 307, 317, 180 NW 636 (1920) (cannot attack "the legal existence of such a court or its de facto officers otherwise than in a direct proceeding by quo warranto"); *Gildemeister v Lindsay*, 212 Mich 299, 180 NW 633 (1920); *Sempliner v FitzGerald*, 300 Mich 537, 2 NW2d 494 (1942); *Cook v Burhans*, 304 Mich 108, 7 NW2d 370 (1942); *People v Russell*, 347 Mich 193, 79 NW2d 603 (1956); *Layle v Adjutant General*, 384 Mich 638, 641; 186 NW2d 559 (1971) ("[Q]uo warranto is the proper and exclusive remedy to try title to office . . . .").

However, this determination is *precisely* the issue to be resolved in a quo warranto action. While this Court could certainly review on appeal the decision made by the Court of Appeals in a quo warranto action,[21] and could determine whether the conduct surrounding respondent's forfeiture of office rose to the level of judicial misconduct warranting judicial discipline,[22] an original proceeding in the Supreme Court[23] is not the appropriate place to determine in the first instance *whether* respondent vacated his office. Rather, the law requires that this question be initiated by the Attorney General and resolved as an initial matter by the Court of Appeals.[24]

Consequently, all evidence and testimony obtained during the proceeding by the JTC regarding whether respondent had vacated his office was obtained through an unconstitutional process because the JTC has no authority to proceed on the quo warranto issue or to determine whether respondent vacated his office.

---

[21] MCR 7.301(2).

[22] Const 1963, art 6, § 30; MCR 9.225. Because no quo warranto action was filed and no determination was made regarding whether respondent vacated his office, we need not determine whether the act of vacating judicial office constitutes sanctionable judicial misconduct.

[23] MCR 7.304.

[24] By analogy, Const 1963, art 6, § 30, provides that this Court may discipline, retire or remove a judge for conviction of a felony. It could hardly be argued, however, that this Court rather than the circuit court should adjudicate and convict the judge of the felony simply because the unresolved predicate issue arose during the course of a judicial disciplinary proceeding. *In re Laster*, 404 Mich 449, 274 NW2d 742 (1979), cited by the JTC, is simply not responsive to this issue.

10

That determination can only be made by the Court of Appeals in a quo warranto proceeding, which could then be appealed to this Court. If a quo warranto action has been successfully brought in the Court of Appeals, and that decision is affirmed by this Court, only then may the JTC act on the appellate court decision and determine whether there has been any judicial misconduct associated with the determination of the Court of Appeals that a judge has vacated his or her office.

Moreover, had the Michigan Supreme Court decided in a quo warranto appeal that respondent *had* vacated his office, the Supreme Court would have had the power to remove respondent from office, and, had that happened, any JTC proceeding regarding judicial misconduct involving the vacation of office would have been moot because the Supreme Court had already exercised the most severe punishment. Simply put, the JTC had the cart before the horse.

Just as the JTC has neither the authority nor the power to decide whether a judge vacated his or her office, this Supreme Court does not have any constitutional authority to grant that authority and power to the JTC. The JTC only has the authority to let the quo warranto process lawfully proceed to a legal determination of whether or not a judge has vacated his or her office.

With regard to our conclusion in this regard, we reject Justice Markman's attempt to characterize the JTC as having made a "determination" to which this Court must defer. The JTC only has the authority to "recommend" disciplinary action. Justice Markman's attempt to couch our "rejection" as unbelievable is improper. Indeed, Justice Markman asserts that a majority of this Court errs in its

11

review of the JTC decision by "afford[ing] *no deference whatsoever* to the Commission's factual findings." *Post* at 1-2 (emphasis added). To be precise, while this Court has a *duty to review* a recommendation, as to the deference afforded the JTC after this Court reads the recommendation, there is no *duty to accept*, or to defer, to any part of the JTC's recommendation. This Court has no duty to accept, even in part, any JTC "decision" because the JTC does not have the power to decide how and whether to discipline a judge; the JTC can only make *recommendations* to this Court and, in this regard our review of JTC recommendations is de novo.[25] *In re Somers*, 384 Mich 320, 323; 182 NW2d 341 (1971).

---

[25] Contrary to Justice Markman's assertion, our decision today does not affect the standard by which this Court reviews JTC recommendations. As Justice Markman accepts, we review the JTC's recommendations de novo. *In re Somers*, 384 Mich 320, 323; 182 NW2d 341 (1971). And we are aware of no mandate that this Court give deference to the JTC's "decisions." The Michigan Constitution does not require that we give any deference to the JTC's "decisions." Moreover, we have held that any deference given to the JTC's "recommendations" is contingent upon us finding that the JTC's analysis was "reasonably done." *In re Chrzanowski*, 465 Mich 468, 488; 636 NW2d 758 (2001). In this case, for the reasons noted in this opinion, we conclude that the JTC's analysis fell below the "reasonably done" threshold. We have also limited any deference regarding factual findings to the *master's* credibility determinations. *Loyd*, *supra* at 535-536. That deference was further limited to when the credibility determination was supported by the whole record. *Id*. We have never articulated a deference requirement toward the JTC's credibility determinations. This is an important distinction in this case because the JTC did not accept the master's credibility determinations; instead, it went beyond the master's conclusions and, as Justice Markman rightly states, "decided" that respondent had moved out of his division at a date earlier than when the master had determined. Notably, it was this "decision" on which the JTC hinged its removal recommendation. Thus, any deference to a credibility determination would apply to the master's findings,

12

As established in Const 1963, art 6, § 30 (2):

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice.

For comparison purposes, consider this scenario: if the JTC believes a judge has committed armed robbery, it has no authority to proceed to determine whether or not the judge did commit armed robbery. Only the criminal judicial system guided by statutes and court rules has the authority to make that determination. If the court process legally determines a judge is guilty of armed robbery, only then can the JTC recognize the legally determined fact that the judge committed the crime and only then can the JTC bring a proceeding for judicial misconduct on the basis of the court's ruling that a judge committed the crime of armed robbery.

---

assuming that they were supported by the entire record; it would not apply to the JTC's contrary "decision." This is yet another reason for us to conclude that the JTC's "recommendation," much less its "decision," granted no deference in this case. It is unclear why Justice Markman believes we are required to give the JTC's "decisions" deference. Further, assuming Justice Markman is correct that this Court is bound to give some modicum of deference to the JTC's recommendations, that rule does not apply here because the JTC's analysis was not reasonably done, and its credibility conclusions are contrary to those of the master.

B. Conduct of the Executive Director of the JTC.

On January 16, 2008, the executive director of the JTC personally served respondent with a 28-day notice pursuant to MCR 9.207(D)(1).[26] The executive director arrived unannounced at respondent's chambers accompanied by an armed Michigan State Police lieutenant. Apparently, unbeknownst to either respondent or the director, the police officer recorded the conversation.

The director presented respondent with the 28-day notice, and asserted that respondent's office was "vacant" because respondent had moved outside his district, as evidenced by his homestead tax exemption affidavit.[27] In addition to the notice, respondent was also presented with a petition for interim suspension without pay, which the director indicated would be immediately filed and mostly likely granted because respondent was "not in office."

The director then offered respondent the "opportunity to resolve" the matter quickly without any "shame, proceedings, [or] accusations of perjury" by resigning "immediately,"[28] presenting respondent with a prepared resignation letter on respondent's court letterhead. The director stated that, although the JTC

---

[26] The notice must be given 28 days before filing a complaint. The "purpose of the notice is to afford the judge the opportunity to apprise the commission, in writing within 28 days, of such matters as the judge may choose, including information about the factual aspects of the allegations and other relevant issues." MCR 9.207(D)(1).

[27] The director indicated that, if respondent had not abandoned his office, then he must have filed a false affidavit, which constituted the crime of perjury.

[28] The director reiterated that "immediately means immediately."

14

indicated that respondent had until 9:00 a.m. the next morning to sign the resignation letter, the director would "prefer" to have the resignation letter signed "right now" so that he could "take the letter with" him.

When the respondent protested, seeking "time to talk to somebody," the director replied that respondent would be "suspended in a matter of days" and that it would all "become public" at a time when respondent was "up for election." The director reiterated the 9:00 a.m. deadline, adding that respondent also faced allegations involving the sexually inappropriate behavior, and the director would get respondent "thrown off [the bench] just for that." When respondent asked questions regarding the basis of the allegations of sexually inappropriate behavior, the director replied that he was not there "to do any type of interview" and would not "explain anything else."

The director told the respondent that he could "take the easy way out" and sign the resignation letter; otherwise, the director "welcome[d] the opportunity" and would "engage to the fullest" if respondent chose to "fight it." When respondent observed that criminal defendants were given "more consideration" than was being afforded to him, the director responded that immediately signing the resignation letter would "avoid having to drag [respondent's] name through the mud," "avoid any embarrassing situations," and avoid the "stain to the state judiciary" of having a judge who "violates the law, commits perjury, [and] sexually harasses staff." After respondent refused to sign the resignation letter on

15

the spot, the meeting concluded.  A moment later, the director was heard saying that "it's like shooting ducks in a barrel."

When these proceedings commenced, the director's threats to humiliate respondent and drag his name through the mud were soon realized.  The details of the present allegations were widely disseminated in the local newspapers, on television and on the Internet over the course of several months.  The controversy, including the facts surrounding the meeting between respondent and director, were the subject of numerous newspaper articles, editorials, and letters to the editor.[29] While the actions of the JTC director have been called into question, this Court need not address whether he violated any ethical rules because the proper forum for the review of the JTC director's actions is the Attorney Grievance Commission (AGC).

### C. Inappropriate Drawings and Comment

The remaining allegation of judicial misconduct concerns respondent's sexually inappropriate conduct directed toward female court employees.  The testimony indicates that on two separate occasions respondent made lewd drawings—one of female breasts and one of a penis—on notes that were attached

---

[29] *Disorder in the District Court?*  The Grand Rapids Press, January 15, 2008, at B2; *State denies squabble over court move was factor,* The Grand Rapids Press, February ___, 2008, at A1; *Residents critical of inquiry involving judge*, The Grand Rapids Press, February 17, 2008, at B1; *Rockford rallies around judge,* The Grand Rapids Press, February 20, 2008, at B1; *Deputies support Servaas' bid*, The Grand Rapids Press, February 27, 2008, at B1; Servaas *attack called 'reckless'*, The Grand Rapids Press, March 1, 2008, at A3.

to two court files. The testimony further indicates that respondent commented on the small chest size of a 2nd division female employee during a retirement party at the 2nd division courthouse. Notably, even respondent realized he had made a mistake because he called the employee the following day to apologize personally to her. Unfortunately, she would not return his calls so he finally left a message on her voice mail apologizing for the gaffe.

Respondent's counsel acknowledged that respondent's conduct was "inappropriate," but contended that it was spontaneous and represented "isolated" incidents from respondent's nearly 37-year career. Respondent's counsel argues that respondent's conduct warrants, at most, a public reprimand. This argument is consistent with the recommendations of the JTC, which indicated that with respect to count 3, respondent's sexually inappropriate conduct merited a public censure.

We agree with the JTC that respondent's sexual conduct was crass and inappropriate; however, we do not agree that respondent's conduct rises to the level of judicial misconduct beyond requiring public censure.

D. Veracity of Respondent's Testimony

While Justice Markman appears to assert that whether or not the JTC had the authority to proceed, sanctions against respondent are appropriate given Justice Markman's conclusion that respondent lied under oath. Having reviewed the entire record closely, we do not agree with Justice Markman's conclusion that

17

respondent lied under oath.[30]  On the contrary, we agree with respondent's counsel that this is not a case of arrogance.  Instead, it appears that respondent believed that he was still properly in his district and that there was no problem with living outside of the 1st division.

At the time these proceedings occurred, respondent had seven residences. He owned homes in both the 1st and 2nd divisions of the 63rd District Court.  He rented a home in the 1st division, and he also owned homes in Whitefish Lake, Michigan; Ludington, Michigan; North Carolina; and Florida.   Respondent testified that he renovates houses as a hobby, and that from 2000 to 2005, he often spent the night at one of the two houses he was renovating in the 2nd division when he was too tired to drive back to his 1st division residence.

---

[30] In fact, respondent's admissions of moving to the 2nd division house establish that respondent believed he had nothing to hide because, under his interpretation of the law, he did not "vacate his office" if he simply lived in another division of the same district.  Further, respondent's failure to change the address on his concealed weapons permit does not establish that he intended to deceive anyone.  In the first instance, respondent was *renewing* his permit.  Since November 13, 2001, the date the respondent first applied for the permit, his address remained the same.   In fact, as demonstrated by succeeding safety inspection certificates and by his own testimony for succeeding years, respondent did not even pay attention to the address line as it had already been completed for him by the Rockford Chief of Police.  All he had to do was sign the permit. Again, rather than a deliberate attempt to deceive officials about his change of address, respondent's explanation was very credible.  Specifically, the failure to change his address was simply an oversight:  respondent did not think to read the form and make any corrections, as he admitted that he did not read the form—he just put the gun and the renewed certificate under the bench.

Thus, during this five-year period, respondent testified that he went back and forth between the houses as necessary for the remodeling projects. Certainly he cannot be expected to have to subsequently provide facts establishing that he was residing in one house or two houses after so much time had passed and without being prompted by any particular reason to so do. Again, respondent's actions in this regard support his perception that it didn't matter whether he spent the night at the 1st division house or the 2nd division house, because he was still residing in the 63rd District.

Respondent admitted that from 2005 on, he resided in the 2nd division home, and the record reflects that he did nothing to hide this fact. Indeed, respondent's name, address, and telephone number for the 2nd division home were listed in the local phone book.

Specifically during a meeting in approximately late March 2006 between respondent, the SCA and the JTC executive director, the SCA said to respondent, "You're not living in your district." In response, respondent said "I am too." Importantly, we note that even though respondent was first accused of vacating his judicial office in early 2006, it appears that no assertion was made again until respondent was ambushed on January 16, 2008. Again, respondent did not try to deny the fact that he was living in the 2nd division at that time, because he thought he could live in that division as long as he was not running for re-election.

Consequently, we do not conclude that respondent lied under oath. At times he seemed confused and could not remember a series of different telephone

19

numbers (until he later refreshed his recollection), specific dates and times, and events that occurred nearly 10 years before he testified. In fairness, we cannot conclude that respondent intentionally lied under oath.

### III. CONCLUSION

Because we conclude that the only appropriate forum to determine whether respondent vacated his judicial office was a quo warranto action filed by the Attorney General in the Court of Appeals, we reject the JTC's recommendation with respect to the vacation of office claim. Because the JTC lacked legal authority to bypass submission of the quo warranto action to the AG, the finding that respondent vacated his office is null and void. The powers held by the JTC simply do not include the power by the JTC to determine the existence of a vacancy in judicial office.

Finally, with respect to the claim against respondent for judicial misconduct involving a comment and two drawings of a sexual manner, while respondent's conduct was unquestionably inappropriate, we believe, under the unique circumstances of this case that only public censure is required. Accordingly, this opinion stands as our public censure.

Pursuant to MCR 7.317(C)(3), we direct the Clerk of the Court to issue the judgment order immediately.

Elizabeth A. Weaver
Michael F. Cavanagh
Diane M. Hathaway

20

STATE OF MICHIGAN

SUPREME COURT

In re Honorable STEVEN R. SERVAAS
Judge, 63rd District Court.                          No. 137633

_____

WEAVER, J. (*concurring separately*).

I authored and join the majority opinion; however, I write separately to request that this Court open an administrative file to investigate how this matter unfolded, including the events and actions of the Judicial Tenure Commission (JTC) and/or others responsible leading up to the JTC's recommendation of this case to this Court.

Elizabeth A. Weaver
Diane M. Hathaway

S T A T E   O F   M I C H I G A N

SUPREME COURT


In re Honorable STEVEN R. SERVAAS,                    No. 137633
Judge, 63rd District Court,

_____

KELLY, C.J. (*concurring in part and dissenting in part*).

I concur in Justice Weaver's opinion except for part II(A) and the portions of the introduction and conclusion discussing quo warranto.

I agree with Justice Markman that the existence of an action for quo warranto does not prevent the JTC from assessing respondent's misconduct, regardless of whether that conduct happens to involve the improper exercise of a title to office. Accordingly, I concur in part II of Justice Markman's opinion.


Marilyn Kelly

STATE OF MICHIGAN

SUPREME COURT

In re Honorable STEVEN R. SERVAAS
Judge, 63rd District Court.

No. 137633

_____

MARKMAN, J. (*dissenting*).

The Court today rejects the unanimous recommendation of the nine-member Judicial Tenure Commission (JTC) to sanction respondent, Judge Steven Servaas, for misconduct that involves moving outside of the district from which he was elected in direct violation of Article 6, § 20 of the Michigan Constitution, and MCL 600.8201, and thereby fundamentally breaching faith with his constituents; and by then engaging in a pattern and practice of actions to conceal this misconduct, including providing false testimony under oath. Based on the Commission's findings and on the record below, I agree with the JTC, and disagree with the majority in its refusal to sanction respondent for conduct directly implicating the integrity of the judiciary. I therefore dissent.

Moreover, in rejecting the JTC's unanimous determination that respondent lied under oath, the majority affords no deference whatsoever to the Commission's

factual findings.[1]  Instead, the majority engages in a superficial analysis that does not accurately reflect the record established in this case.

Perhaps most remarkably, in asserting that the JTC lacks jurisdiction to sanction respondent, Justice Weaver in her lead opinion (albeit not a majority opinion in this regard) concludes that the JTC lacks even the *authority* to investigate a judge for breaching his or her constitutional obligations, on the grounds that the JTC is forbidden even to undertake actions regarding judicial misconduct if such misconduct could "in the first instance" have been addressed by an alternative legal proceeding, in this case by an action for quo warranto. Justice Weaver's assertion is a profoundly distorted interpretation of the JTC's authority and would significantly circumscribe the Commission's ability to effectively investigate and address instances of judicial misconduct.

## I. FACTS

In January of 2008, the JTC initiated proceedings against respondent, asserting that he had moved outside the 1st division of the 63rd District Court

---

[1] Justice Weaver asserts that this Court has "no duty to defer to . . the JTC recommendation[s] . . . or . . . decision[s]," *ante* at 12.  It may be worth noting that this statement of firm conviction is directly contrary to *In re Brown*, 461 Mich 1291, 1293 (2000), in which this Court, including Justice Weaver, stated that "[w]here standards . . . have been promulgated [by this Court] and reasonably applied to individual cases, this Court owes considerable deference to the JTC." Further, in *In re Chrzanowski*, 465 Mich 468, 488; 636 NW2d 758 (2001), again with Justice Weaver in the majority, this Court stated that "[w]e find [the JTC's] analysis to be reasonably done and therefore accord the recommendations of the JTC considerable deference."

located in Kent County, and from which he had been elected, in violation of the constitution and statutes of this state.[2]  This belief was premised on respondent having moved his residence to 201 Honey Creek Avenue, a property located in the 63rd District's 2nd division.  On January 16, 2008, the JTC's examiner, accompanied by an officer from the Michigan State Police, went to respondent's office to deliver charging papers.  The examiner communicated the JTC's belief that respondent had moved outside his division and, therefore, had vacated his office.  The examiner told respondent he could resign by the next day or else be subject to disciplinary proceedings, including an immediate petition for interim suspension without pay.  Respondent did not resign.

On January 17, 2008, the JTC filed a petition for interim suspension with this Court on the ground that respondent's residence was outside the 1st division. The next day, the JTC filed a supplemental petition, arguing that respondent had

---

[2] The 63rd District Court has two divisions.  The 1st division includes the cities of Cedar Springs and Rockford, and the townships of Tyrone, Solon, Nelson, Spencer, Sparta, Algoma, Courtland, Oakfield, Alpine, Cannon, Plainfield, and Grattan, and "has 1 judge."  MCL 600.8130(4)(a).  The 2nd division encompasses the township of Ada, as well as the cities of East Grand Rapids and Lowell, and the townships of Grand Rapids, Cascade, Vergennes, Lowell, Byron, Gaines, Caledonia and Bowne, and also "has 1 judge."  MCL 600.8130(4)(b).  Respondent has been regularly elected to, and has maintained his courtroom in, the 1st division in Rockford, Michigan since January 1973.

3

created a "dangerous situation" by keeping a loaded pistol behind his bench.[3]  This Court unanimously denied this petition on February 1, 2008.

On February 14, 2008, the JTC filed a second petition for interim suspension, setting forth the additional argument that respondent had removed himself from his elected division and also engaged in inappropriate behavior.  The JTC also filed a complaint against respondent on the same day.  The complaint alleged that respondent had vacated his judicial office by moving his residence from the 1st division to the 2nd division, and that he was not a registered elector of the division from which he was an elected judge.  The complaint also alleged that respondent engaged in misconduct directed toward female court employees.  This Court unanimously denied the second petition on April 9, 2008.

Pursuant to MCR 9.210(B)(1) we appointed a master to hold hearings and make findings of fact and law.[4]  The master held a hearing between March 28, 2008, and April 3, 2008, to determine the merit of the allegations contained in the JTC's complaint.  The master found that respondent had moved to 201 Honey Creek in 2005 in violation of Article 6, § 20 of the Michigan Constitution.  By doing so, he was also no longer a "registered elector" of the 1st division as

---

[3] During the examiner's visit on January 16, 2008, the Michigan State Police officer confiscated the pistol from an unlocked box behind the bench.  The examiner did not allege any misconduct in the complaint based on the pistol, and respondent possessed a valid concealed weapons permit.

[4] The master was Casper O. Grathwohl, a retired judge from the 2nd Circuit Court in Berrien County.

4

required by MCL 600.8201. Thus, the master concluded that respondent had failed to comply with the constitutional and statutory requirements necessary to hold a judicial position, in violation of Canon 2(B) of the Code of Judicial Conduct.[5] The master also concluded that certain inappropriate drawings and comments on respondent's part constituted judicial misconduct and compromised the integrity of the court. Respondent then filed objections with the master's findings to the JTC in accordance with MCR 9.215.[6]

On October 17, 2008, the JTC unanimously agreed with, and adopted, the master's findings, except that the Commission found that respondent had, in fact, moved to 201 Honey Creek in Ada Township in 2000 rather than 2005.[7] This finding was based primarily on telephone logs that the examiner had introduced

---

[5] Canon 2(B) of the Code of Judicial Conduct states:

> A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary. . . .

[6] MCR 9.215 states in part:

> [T]he examiner or the respondent may file with the commission an original and 9 copies of a statement of objections to the report of the master, along with a supporting brief.

[7] MCR 9.220(B)(1) authorizes the JTC to adopt the master's findings in whole or in part, and provides:

> The commission must make written findings of fact and conclusions of law along with its recommendations for action with respect to the issues of fact and law in the proceedings, but may adopt the findings of the master, in whole or in part, by reference.

5

during the master's hearing. These logs contained telephone numbers that respondent had provided to the district court indicating where he could be located after hours,[8] and showed that respondent provided his 201 Honey Creek telephone number almost exclusively as his after-hours contact location from 2000 until 2008. From these logs, the JTC concluded that respondent's consistent listing of 201 Honey Creek as his after-hours location for an eight year period indicated that he, in fact, had lived at 201 Honey Creek during that time. Moreover, the JTC found that respondent's assertion that he had not moved outside of his division prior to 2005 demonstrated a "lack of candor and honesty," which amounted to "false testimony" as to his residence from 2000 to 2005.

Based on these findings, the JTC recommended that respondent be removed from office. He now challenges that recommendation and argues that this Court lacks the authority to sanction him for judicial misconduct because an action for quo warranto constitutes the exclusive legal proceeding to evaluate his title to office before his November 2008 reelection.

## II. QUO WARRANTO

Justice Weaver agrees with respondent and asserts that this Court need not decide whether the allegations set forth in the complaint are true "because our

---

[8] As part of his judicial duties, respondent was required to be "on call" several nights per week in order to respond to police requests for warrants, and for other emergencies. Judges and magistrates rotated being on call, and were required to provide an after-hours contact number at which they could be reached.

6

statutes, caselaw and court rules provide that a quo warranto action brought by the Attorney General in the Court of Appeals *is the only appropriate and exclusive proceeding to make the preliminary determination regarding whether respondent vacated or unlawfully held his judicial office*." *Ante* at 8 (Emphasis in original). In my view, Justice Weaver misapprehends the nature of the action now before this Court, which is a *disciplinary* proceeding that the JTC and this Court are constitutionally empowered to pursue, Const 1963, art 6, § 30(2), not an action directly concerned with respondent's current claim to his office.[9] Most importantly, this Court's authority to sanction judicial misconduct is not restricted, or otherwise affected in any way, by the existence of an action for quo warranto, which is only available for the purposes of removing from public office an official who fails currently to hold valid title to that office. Finally, Justice Weaver's assertion that the JTC, in the context of a disciplinary proceeding which involves the validity of a judge's title to office, *must* rely on the factual findings of the Court of Appeals in a quo warranto action is directly contrary to this Court's own guidance in *In re Kapcia*, 389 Mich 306; 205 NW2d 436 (1973), and would

---

[9]Although an action for quo warranto is altogether unrelated to the disciplinary action at issue here, Justice Weaver, and respondent, set forth what I view as an erroneous theory suggesting that the JTC has no authority to use any facts that could support a judicial disciplinary action if those facts could also be used in a quo warranto proceeding. Because, in my judgment, this theory would preclude this Court from considering facts that are necessary to fully address respondent's misconduct and to determine a proportionate sanction, I believe it is necessary to refute this theory. I reiterate, however, that Justice Weaver's theory, although set forth in the lead opinion, does not have majority support.

7

undermine the JTC's duty to make individualized and independent factual findings with regard to whether judicial misconduct has occurred.

The JTC is a constitutionally established entity, Const 1963, art 6, § 30(1), that was created to assist the people of Michigan, and this Court, in evaluating the conduct and behavior of judges currently holding office throughout this state. Article 6, § 30(2) of the Michigan Constitution describes the relationship between the JTC and this Court as follows:

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, *misconduct in office*, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings. [Emphasis added.]

In MCR 9.205(B), this Court has provided guidance to the JTC for determining what constitutes judicial "misconduct in office":

> A judge is subject to censure, suspension with or without pay, retirement, or removal for conviction of a felony, physical or mental disability that prevents the performance of judicial duties, misconduct in office, persistent failure to perform judicial duties, habitual intemperance, or conduct that is clearly prejudicial to the administration of justice. In addition to any other sanction imposed, a judge may be ordered to pay the costs, fees, and expenses incurred by the commission in prosecuting the complaint only if the judge engaged in conduct involving fraud, deceit, or intentional misrepresentation, or if the judge made misleading statements to the commission, the commission's investigators, the master or the Supreme Court.

8

(2) Conduct in violation of the Code of Judicial Conduct or the Rules of Professional Conduct may constitute a ground for action with regard to a judge, whether the conduct occurred before or after the respondent became a judge or was related to judicial office.

(3) In deciding whether action with regard to a judge is warranted, the commission shall consider all the circumstances, including the age of the allegations and the possibility of unfair prejudice to the judge because of the staleness of the allegations or unreasonable delay in pursuing the matter.

In addition, MCR 9.220(B) expressly authorizes the JTC to make both factual and legal determinations regarding whether a judge has committed misconduct that warrants an official sanction, which may range from a private censure to removal from office, and, as noted at note 7 *supra*, it allows the JTC to adopt the master's findings in whole or in part.

Although the JTC and this Court are constitutionally vested with the authority to address *all* matters of judicial misconduct, Justice Weaver concludes that this authority is implicitly limited by the existence of an action for quo warranto. Quoting *Frey v Michie*, 68 Mich 323, 327; 36 NW 184 (1888), she notes that the "determination can only be made . . . in a quo warranto proceeding." *Ante* at 11.

As an initial matter, Justice Weaver's discussion of quo warranto fails to acknowledge that an action for quo warranto is an entirely distinct legal

9

proceeding from a disciplinary action initiated by the JTC.[10] As provided in MCR 3.306(A)(1),

> [a]n action for quo warranto against a person who usurps, intrudes into, or unlawfully holds or exercises a state office, or against a state officer who does or suffers an act that by law works a forfeiture of the office, must be brought [by the Attorney General] in the Court of Appeals.

Because an action for quo warranto can be pursued against "a person" who unlawfully holds *any* "state office," including a judgeship, this action, in one sense, has a much broader application than a JTC disciplinary action, which can only be initiated against a judge. However, unlike a JTC proceeding, an action for quo warranto is only available to address a narrowly circumscribed range of judicial misconduct, which is restricted to that calling into question a judge's title to office. To that extent, an action for quo warranto has a more limited application than a JTC disciplinary action. Perhaps most importantly, the fact that these two actions may sometimes be applicable to the same set of facts, does not alter the distinctive nature of each, and certainly does not indicate that the viability of one is somehow restricted by the existence of the other.

---

[10] In light of the distinct nature of these proceedings, as expressly recognized in this opinion, it is remarkable that Justice Weaver could assert that I somehow claim that "the JTC has [] legal authority to bring a complaint of quo warranto *and* a complaint of judicial misconduct in a JTC proceeding." *Ante* at 4 n 9 (emphasis added). This is a badly distorted interpretation of what is plainly stated, to wit, that the JTC can never pursue an action for quo warranto under any circumstances.

Although respondent's conduct did call into question his title to office between 2000 and 2008, there is no statutory or constitutional restriction on the JTC's authority to proceed with an action based upon the misconduct that was represented by his actions. In fact, despite the fact that an action for quo warranto and a JTC disciplinary action may overlap in their applicability to some instances of judicial misconduct, as they did here prior to the date respondent began serving his new term of office in 2009, Justice Weaver has supplied no rationale as to why an action for quo warranto, which was created by the Legislature and this Court, should constitute the exclusive means to address such misconduct, especially in view of the fact that the JTC is the only entity that is constitutionally empowered to address *all* matters of judicial misconduct.

In addition to the fact that an action for quo warranto is altogether distinct from a JTC disciplinary proceeding, there are three supportive arguments for why an action for quo warranto has no application in the instant context. First, an action for quo warranto is only applicable to claims that a public official is *currently* exercising an invalid title to office.[11] This observation is supported by MCL 600.4505, which describes the nature of a quo warranto action:

---

[11] Justice Weaver asserts that "[t]here is no support for [my] argument," *ante* at 8 n 15, that "actions for quo warranto may only be brought against claims that an officer is *currently* exercising an invalid title to office." (Emphasis added.) Quite apart from the law that has been cited in this section, Justice Weaver seems to be unaware that a judge who previously held unlawful title to office could never be subject to a quo warranto action because the issue would necessarily be moot.

(1) In actions brought against persons for usurpation of office, the judgment may determine the right of the defendant to hold the office. If a party plaintiff alleges that he is entitled to the office, the court may decide which of the parties is entitled to hold the office.

(2) If judgment is rendered in favor of a party who is averred to be entitled to the office, he is entitled, after taking the oath of office, and executing any official bond which is required by law, to take the office. Such party shall be given all the books and papers in the custody of the defendant, or within his power, belonging to the office.

Significantly, MCL 600.4505 uses language written exclusively in the active voice, which suggests that the Legislature did not intend for this action to be initiated against a public official who is not currently holding office or who has previously exercised title to his or her office improperly. Indeed, as indicated in MCL 600.4505, and further supported by MCL 600.4511 and MCL 600.4515, an action for quo warranto is most frequently the procedure employed to resolve *conflicting* claims to office.[12] MCL 600.4511 provides:

When an action is brought against a person for usurping an office and the person rightfully entitled to the office is a party and

---

[12] The only apparent exception to the rule that a quo warranto action may only be brought to oust an officer who is currently exercising authority under an invalid claim to office is described in *Osterhous ex rel Vander Veen v Van Duren*, 168 Mich 464, 466; 134 NW 456 (1912), in which this Court stated:

Ordinarily proceedings to try title to a public office cannot be brought after the term has expired, or when it is so nearly expired that the inquiry would be of no effect; but an action commenced during the term of office may be prosecuted to final judgment after the expiration of the term, for the recovery of damages or costs which relator has sustained or incurred by the wrongful assumption of authority.

avers his right to it, and judgment is rendered in his favor, he is entitled to any damages sustained because of the usurpation by the defendant of the office from which the defendant has been evicted. The claim for damages may be joined with the claim for quo warranto, or brought separately within 1 year after the judgment in the action for quo warranto.

MCL 600.4515 provides:

Whenever any defendant in a quo warranto proceeding is found or adjudged guilty of usurping or intruding into or unlawfully holding or exercising any office, franchise, or privilege, judgment shall be rendered that the defendant be ousted and altogether excluded from that office, franchise, or privilege. In addition to awarding costs against the defendant, the court may, in its discretion, impose a fine upon the defendant found guilty, not exceeding $2,000.00.

Thus, MCL 600.4511, again using the active voice, suggests that an action for quo warranto constitutes a procedure intended to resolve conflicting claims to an office, regardless of whether misconduct was involved, by determining which party has the superior current claim.[13] Because there is no dispute as to

---

[13] Although quo warranto is most often used to determine competing claims to an office, *Lamoreaux v Ellis*, 89 Mich 146, 161; 50 NW 812 (1891), nonetheless makes clear that an action for quo warranto may be used to oust a current "intruder" from office even without a competing claim. *Lamoreaux* states:

The attorney general ought not to institute proceedings by *quo warranto* upon the relation of a citizen having no claim of title to the office, unless the showing is such as to afford reasonable grounds for the belief that the incumbent of the office is an intruder therein, or one not competent under the Constitution to hold it. [*Id*.]

Indeed, this is the purpose for which the writ was originally employed in England. Although the writ dates back as far as the reign of King Richard I (1189-1199), it was most notably invoked during the reign of King Edward I (1272-1307).

respondent's *current* claim to office, an action for quo warranto has no application to the present facts.

Second, MCL 600.4515 provides that the sole remedy for a quo warranto action is that a "judgment shall be rendered that defendant be *ousted . . . .*"[14] By contrast, a disciplinary action initiated by the JTC can result in a range of sanctions spanning from a simple censure to removal from office, see Const 1963,

_____

Claimants were to appear before them [itinerant judges riding in circuit], and if it was found that they actually held any franchise, a writ of quo warranto would be served on them, requiring them to show by what warrant they claimed to have the liberty of wreck, or gallows, or view of frankpledge, or return of writs, or whatever it might be. Frohnen, *The one and the many: Individual rights, corporate rights and the diversity of groups*, 107 W Va L R 789, 818 (2005). If the claimant could not answer the writ successfully by showing the proper exercise of title, the franchise could be confiscated by the Crown. *Id*. The writ was then carried over to America in 1685 when King James II unsuccessfully attempted to use quo warranto proceedings to "revok[e] the colonial charters of the proprietary colonies in New England[]" as a method of maintaining control over the colonies. Gitelman, *The separation of law and equity and the Arkansas chancery courts: Historical anomalies and political realities*, 17 U Ark Little Rock L J 215, 228 (1995). Thus, both historically and currently, quo warranto actions have never been used to ascertain whether an officer or franchise-holder *previously* exercised proper title to office, and never has the writ been invoked to discern whether the one who claims valid title has engaged in misconduct, much less *previous* misconduct.

[14] See *Attorney General ex rel Cook v Burhans*, 304 Mich 108; 7 NW2d 370 (1942) ("The attorney general . . . by information in the nature of quo warranto, seeks ouster of defendant from the office of regent of the University of Michigan on the ground that he has no legal right to the office and is a mere usurper therein . . . Defendant having usurped the office of regent, in defiance of the mandate of the constitution barring him under any circumstances from holding such office and rendering all votes cast for him void, it was proper for the attorney general to bring this proceeding in the nature of quo warranto to oust him from such office."); *Layle v Adjutant General*, 384 Mich 638, 642; 186 NW2d 559 (1971), citing *Sobocinski v Quinn*, 330 Mich 386; 47 NW2d 655 (1951) ("[P]laintiff instituted quo warranto proceedings to oust defendant from office[.]").

14

art 6, § 30(2), and the JTC and this Court must ultimately determine what constitutes a "reasonable relationship," or "proportionality," between particular misconduct and these available sanctions. *In re Brown*, 461 Mich 1291, 1292 (2000). Thus, the inflexible "one size fits all" remedial aspect of a quo warranto action also demonstrates why the disciplinary action being pursued by the JTC is the proper proceeding in which to address respondent's misconduct.

Third, as this Court concluded in *Kapcia*, 389 Mich at 314, the JTC is prohibited from relying on, or adopting, another entity's factual findings and conclusions as a basis for recommending that this Court impose a sanction for judicial misconduct; rather, the JTC must make independent factual findings in this regard. In *Kapcia*, the Attorney Grievance Commission revoked the respondent's license to practice law. However, shortly thereafter, the respondent was elected as a probate judge. The JTC, citing the revocation of the respondent's law license, argued that the respondent had violated Article 6, § 19 of the Michigan Constitution, which requires all judges in this state to have a valid law license.[15] Thus, the JTC concluded that the respondent had vacated his office and had therefore committed judicial misconduct. This Court rejected that argument, stating:

---

[15] Article 6, § 19 states that "justices and judges of courts of record must be persons who are licensed to practice law in this state."

15

Manifestly, this contention begs the question; it presupposes that the removal from office which the [JTC] seeks by these proceedings to accomplish has already occurred.

The [JTC]'s presentation proceeds on the erroneous assumption that the [JTC] had no choice once it was established that Judge Kapcia had been suspended from the practice of law but to recommend his removal and that this Court, likewise, has no choice but to remove him; that, indeed there truly is nothing before us to consider because the consideration of whether the professional misconduct charged against Judge Kapcia was proven and what to do about it ended when the order of the Grievance Board became final.

The discipline of judges is confided to the discretion of the [JTC] and this Court under § 30 of art 6. It is left to [a] case-by-case exercise of discretion to decide whether a justice or judge— presumably duly licensed to practice law when he qualified as a justice or a judge—whose conduct results in [the] loss of his right to practice law should be disciplined by removing him from office. [*Kapcia*, 389 Mich at 314.]

Ultimately, *Kapcia* concluded that the JTC must investigate the facts underlying the Attorney Grievance Commission's decision to suspend the respondent's license in order to determine if judicial misconduct had occurred.

Thus, had the Commission commenced a proceeding against Judge Kapcia charging him with misconduct based on the acts which gave rise to the State Bar grievance proceedings, the Commission would have been obliged to consider all the circumstances in deciding whether to recommend disciplinary action. The Commission's responsibility in that regard cannot be avoided by viewing the matter as a *fait accompli*. Nor can we, by total reliance on the decision reached in the grievance proceedings, escape our responsibility to exercise an individualized judgment. [*Id*. at 312.]

In holding that the JTC cannot escape its responsibility to "exercise an individualized judgment" based on "all circumstances," to determine what disciplinary action is appropriate, *Kapcia* indirectly observed that the JTC and this

16

Court must possess the authority to examine a judge's misconduct for actions that may also serve as the basis for a quo warranto action. Specifically, *Kapcia* distinguished cases on which the JTC had relied, in which judges had been ousted from office for losing their license to practice law, thereby amounting to a vacation of office, because those cases all involved actions for quo warranto. *Id*. at 313-314. There is simply no reason for this Court to have discussed the proper procedure for pursuing disciplinary actions against the judge in *Kapcia*, while expressly recognizing that other cases for quo warranto have resulted in ousting a judge from office for losing his or her license, if the JTC is not empowered to make recommendations for disciplinary actions, which this Court is then free to accept or reject, based on conduct that could also form the basis of a quo warranto action.[16]

In contrast to this Court's holding in *Kapcia*, the majority states:

> While this Court could certainly review on appeal the decision made by the Court of Appeals in a quo warranto action, and could determine whether the conduct surrounding respondent's forfeiture of office rose to the level of judicial misconduct warranting judicial discipline, an original proceeding in the Supreme

---

[16] Justice Weaver states that *Kapcia* "does not support" the assertion that "actions for *quo warranto* may only be brought for claims that an officer is *currently* exercising an invalid title to office." *Ante* at 8 n 15. However, I do not cite *Kapcia* for such a proposition. Rather, I cite *Kapcia* only for the proposition that the JTC is prohibited from using the findings of another entity as a substitute for engaging in its own factual inquiries. Thus, *Kapcia* is pertinent here by establishing that the JTC cannot simply adopt the Court of Appeals' findings of fact in a quo warranto action as a substitute for making its own independent factual findings regarding judicial misconduct.

17

Court is not the appropriate place to determine in the first instance *whether* respondent vacated his office. Rather, the law requires that this question be initiated by the Attorney General and resolved as an initial matter by the Court of Appeals. [*Ante* at 10.]

Justice Weaver's assertion that a quo warranto action is a prerequisite to the JTC's, and this Court's, ability to make determinations that respondent committed misconduct, including specifically the vacation of office, by stating that "an original proceeding in the Supreme Court is not the appropriate place to determine "*in the first instance*" that misconduct occurred, is exactly counter to *Kapcia*'s counsel that the JTC's "responsibility in that regard cannot be avoided by viewing the matter as a *fait accompli*." Rather, the JTC must make independent findings of fact that misconduct occurred, irrespective of another entity's findings and conclusions regarding the same issue. Therefore, even if the Attorney General had successfully pursued a quo warranto action against respondent during his prior term in office, the JTC would *still* have had to make its own factual findings that respondent vacated his office in a current disciplinary proceeding as a precondition to the conclusion that such a vacation of office constituted judicial misconduct.

Justice Weaver demonstrates her confusion in this regard by stating:

By analogy, Const 1963, art 6, § 30, provides that this Court may discipline, retire or remove a judge for conviction of a felony. It could hardly be argued, however, that this Court rather than the circuit court should adjudicate and convict the judge of the felony simply because the unresolved predicate issue arose during the course of a judicial disciplinary proceeding. [*Ante* at 9 n 22.].

18

This Court does not "convict a judge of [a] felony" simply because the same facts that support the felony are presented "during the course of a judicial disciplinary proceeding." Rather, a disciplinary proceeding against a judge may properly lead to a finding of facts by a preponderance of the evidence that judicial misconduct has occurred, *In re Noecker*, 472 Mich 1, 8; 691 NW2d 440 (2005) (holding that the examiner has "the burden of proving the allegations by a preponderance of the evidence"), which might otherwise constitute a felony if found by the circuit court beyond a reasonable doubt.[17] Justice Weaver's example of the circuit court having to find that a felony actually occurred before the JTC can recommend that the judge be removed for committing a felony does not address the issue now before this Court. Article 6, § 30(2) of the Michigan Constitution explicitly allows a sitting judge to be removed from office if he is found guilty of a felony. This is

---

[17] This observation also seems to have led to confusion on Justice Weaver's part, whereby she notes that "it could hardly be argued, however, that this Court rather than the circuit court should adjudicate and convict the judge of the felony simply because the unresolved predicate issue arose during the course of a judicial disciplinary proceeding." *Ante* at 10 n 24. Once again, despite an express statement to the contrary, in this instance that "this Court does not convict a judge of a felony," but rather finds "by a preponderance of the evidence that judicial misconduct has occurred," Justice Weaver directly misrepresents the proposition being asserted. See also note 8, *supra*. Neither this Court nor the JTC can convict a judge of a felony. However, the JTC can consider, as a basis for recommending that a judge be sanctioned, the underlying actions that constitute judicial misconduct. For example, a judge who assaults another person, but who is not ultimately convicted for one of any number of reasons unrelated to his culpability, may still be subject to a JTC disciplinary action on the basis of such conduct. Does Justice Weaver truly disagree with this same proposition? Does she believe that a judge under these circumstances would be immune from a JTC disciplinary action?

one of several specifically enumerated situations in the constitution that effectively establish a substituted process, i.e., a process allowing the JTC and this Court, to view something as a "*fait accompli*" without requiring an individualized fact-finding process to determine that a judge has engaged in misconduct.[18] *Kapcia*, 389 Mich at 313. Notably, however, an action for quo warranto is not one of the specifically enumerated situations that would allow the JTC to bypass its responsibility to make an "individualized judgment" based on "all the circumstances," which is required before the JTC can recommend that this Court sanction a judge for misconduct.

In sum, Justice Weaver's failure to recognize the distinction between a quo warranto action and a disciplinary action is of critical importance. She is correct that an action for quo warranto constitutes the "exclusive method for trying title to office," *Gildemeister v Lindsay*, 212 Mich 299, 303; 180 NW 633 (1920), but the exclusive nature of such an action would exist in regard to a judge only if no judicial misconduct was involved. Where a judge's actions constitute misconduct *and* a vacation of office, *both* an action for quo warranto, initiated by the Attorney General, and a disciplinary proceeding, initiated by the JTC, may be pursued. Here, the JTC has initiated a disciplinary action based on respondent's misconduct which, as a result of his intervening reelection in November 2008, now pertains to

---

[18] See *Kapcia*, 389 Mich at 313, for a listing of these specifically enumerated situations.

respondent's *previous* term in office, which in turn means an action for quo warranto is no longer apposite. Further, unlike an action for quo warranto, a disciplinary action initiated by the JTC can address a judge's misconduct that occurred before his current term in office, MCR 9.205(B)(2), and may result in an appropriate sanction short of removal from office. MCR 9.205(B). Because an action for quo warranto cannot lie where the term of office for which the title being contested has expired, *Layle*, 384 Mich at 642,[19] which as Justice Weaver correctly notes is exactly the situation now before this Court because of respondent's reelection in 2008, the *only* avenue available to address his past conduct is the very type of disciplinary proceeding that the JTC has initiated here. As a consequence, this Court *does* possess the authority, derived from the

_____

[19] Indeed, if the Attorney General pursues a proper action for quo warranto, but, before that claim is resolved, the judge wins a subsequent reelection, the action becomes moot and must be dismissed. As we stated in *Layle*, *supra* at 645:

> Even if the office has not been abolished, proceedings to try title to a public office cannot be brought after the term has expired, or even if it is so nearly expired that the inquiry would be of no effect. *Osterhous ex rel Vander Veen v Van Duren*, 168 Mich 464; 134 NW 456 (1912). The writ generally will not lie to try the abstract title to an office.

Although such a result initially may seem anomalous, the fact that a quo warranto action cannot survive without an ongoing dispute regarding an individual's title to office simply emphasizes the point that an action for quo warranto is of a fundamentally different nature than a disciplinary action initiated by the JTC. Whereas an action for quo warranto is only viable so long as there remains a current dispute regarding a judge's title to office, a disciplinary action arising from misconduct that undermined one's title to office remains available after the title dispute has been resolved or rendered moot.

21

constitution, to sanction respondent for his misconduct, based on the JTC's findings of misconduct and recommendation for discipline.[20]

Finally, Justice Weaver's misunderstanding of quo warranto would generate several notable consequences. As an initial matter, Justice Weaver concludes that the JTC is precluded from bringing a disciplinary action against respondent in the absence of an action for quo warranto. That is, this Court would not be entitled to accept the JTC's recommendation for disciplinary action based on a judge's misconduct that also called into question even his *current* title for office if the Attorney General, an independent executive-branch officer, was unwilling for any reason to pursue an action for quo warranto. This, in my judgment, is a significant limitation upon the JTC's, and this Court's, constitutional prerogatives that is nowhere found within Article 6, § 30(2).

---

[20] Justice Weaver claims that my argument "conflates the complaint of vacation of office with other complaints concerning inappropriate sexual conduct." *Ante* at 4 n 9. As with several of her other arguments, see notes 8 and 15, *supra*, this has utterly no basis in the actual language of this opinion. As should be quite clear to the ordinary reader, the discussion of quo warranto in this opinion is only relevant to whether respondent can be sanctioned for his "misconduct" of vacating the district from which he was elected. By its very terms, the discussion of quo warranto has no relevance to any other alleged incident of misconduct in this case.

The lack of regard for precision in language is further reflected in Justice Weaver's characterization that I describe her rejection of the JTC's recommendations as "unbelievable," *ante* at 11, a word I use only in an entirely different context with reference to certain actions of the *respondent*. *Infra* at 45. My *actual* analysis of Justice Weaver's opinion is that it is legally and constitutionally unsound, confused in its understanding of the record, and unconcerned by logical consequences, not that it is "unbelievable."

Equally important, such a result would undermine the very purpose of this constitutional provision, i.e., to foster public confidence in the integrity of the judiciary.

Additionally, Justice Weaver would apparently extend her novel quo warranto analysis to judicial misconduct that alternatively gives rise to a potential felony charge. By doing this, she would prohibit the JTC from recommending disciplinary action against a judge based on the underlying actions for such a charge unless there was a formal felony conviction. This remarkable proposition would allow judges in this state to commit criminal behavior for which the JTC would have no authority to address. Under Justice Weaver's misapprehension of the JTC's constitutional authority, the underlying conduct forming a felony charge, whether assault, theft, arson, or fraud, could not then form the basis for a finding of judicial "misconduct in office," because "it is only when [a trial] court process legally determines a judge is guilty of [a felony]" *ante* at 13, that the JTC can then "bring a proceeding for judicial misconduct," *id*., based on the facts necessary to support that conviction. *Ante* at 12 n 25.[21] Justice Weaver's arguments find absolutely no support in the law or constitution of this state.[22]

---

[21] The extent to which Justice Weaver would apply her analysis to other contexts such as when a judge engages in acts that could form the basis of a misdemeanor conviction, or even a civil penalty, imposed by a trial court or administrative agency, is unclear. That such circumstances may not be involved in the instant case does not, of course, make it any less irresponsible to propose a new constraint upon the JTC and leave open to question the extent to which this constraint will be carried out to its logical ends. Almost certainly, if Justice

In sum, the existence of an action for quo warranto does not prevent the JTC from assessing respondent's misconduct, regardless of whether that conduct happens to involve the improper exercise of a title to office. Once that assessment has taken place and a recommendation made, as here, this Court is fully authorized to consider that recommendation, and I would do so.

## III. EXAMINER'S CONDUCT

As previously noted, the JTC's examiner visited respondent's chambers and demanded that he resign from his position. I concur with the facts in this regard as set forth by the majority, and agree that, at present, "the proper forum for the review of the JTC director's actions is the Attorney Grievance Commission." *Ante* at 16.

---

Weaver's unprecedented understanding of the JTC's authority was to prevail, it would ensure that judges subject to JTC discipline routinely raise the "Weaver-defense," i.e., that their conduct fell beyond the scope of the JTC's authority, at least until a trial court or administrative body had "in the first instance" rendered a decision.

For what it is worth, Justice Weaver's theory also contradicts her own dissenting opinion in *In re Gilbert*, 469 Mich 1224, 1234 (2003), cf. note 2 *supra*, in which she opined that "judicial disciplinary proceedings are neither criminal nor quasi-criminal in nature." *Id*. In *Gilbert*, Justice Weaver criticized the majority for not imposing a more severe sanction on Judge Thomas Gilbert for smoking marijuana, *id*.-- an action for which Judge Gilbert could have been, but was not, criminally convicted.

[22] Also of concern is whether, under Justice Weaver's theories, the JTC and this Court would be *bound* by the factual and legal findings of trial courts and administrative agencies in cases of judicial misconduct. This Court in *Kapcia* conclusively answered this question in the negative, but this is precisely what Justice Weaver suggests is required of the JTC and this Court.

I do disagree, however, with the majority's implication that the tactics engaged in by the examiner, even if they eventually prove to have been wrongful or inappropriate, have any particular relevance to the matter now before us. This Court cannot, as a function of the examiner's behavior, avoid its responsibility to address respondent's misconduct. To do so would be tantamount to adopting, in the context of judicial discipline, some variant of the "exclusionary rule," which requires "the exclusion of reliable evidence when the constable blunders." *Stone v Powell*, 428 US 465, 496; 96 S Ct 3037; 49 L Ed 2d 1067 (1976). Here, there is no claim that the examiner obtained any evidence in this case by unlawful means. Moreover, if we were to allow the examiner's troubling behavior to influence our evaluation of respondent's misconduct by failing to impose a sanction based solely on respondent's misconduct, our decision would be contrary to MCR 9.200, which states:

> An independent and honorable judiciary being indispensable to justice in our society, subchapter 9.200 shall be construed to preserve the integrity of the judicial system, to enhance public confidence in that system, and to protect the public, the courts, and the rights of the judges who are governed by these rules in the most expeditious manner that is practicable and fair.

In sum, disregarding a judge's misconduct out of disdain for the examiner's behavior is not a rational response designed to "preserve the integrity of the judicial system," nor does it "enhance public confidence in that system." Thus, in keeping with this Court's responsibility to uphold the integrity of the judiciary, the Court should determine an appropriate sanction based solely on respondent's

25

misconduct, irrespective of the examiner's conduct which remains the subject of administrative consideration at this time.

## IV. STANDARD OF REVIEW

This Court reviews the JTC's factual findings and disciplinary recommendations de novo. *Noecker*, 472 Mich at 8.[23] "The JTC's finding of misconduct must be supported by a preponderance of the evidence." *In re Haley*, 476 Mich 180, 189; 720 NW2d 246 (2006). However, "[a]lthough we review the JTC's recommendations de novo, this Court generally will defer to the JTC's recommendations when they are adequately supported." *Id.* See also *Chrzanowski*, 465 Mich at 488; *Brown*, 461 Mich at 1293.

## V. RESPONDENT'S CONDUCT

### A. Violating Law and Constitution

The JTC has issued a decision and recommendation for discipline in this case concluding, among other things, that respondent moved outside the division from which he was elected in violation of Article 6, § 20 of the constitution and that he was not a registered elector of the division from which he was elected, as required by MCL 600.8201. According to the JTC, these are violations of the law and constitution that also constitute judicial misconduct sanctionable under

---

[23] "[I]t is the JTC's, not the master's, conclusions and recommendations that are ultimately subject to review by this Court." *In re Chrzanowski*, 465 Mich at 481.

26

Canons 1 and 2 of the Code of Judicial Conduct and Article 6, §§ 20 and 30(2) of the constitution. [24] I agree.

Article 6, § 20 of the Michigan Constitution states:

> Whenever a justice or judge removes his domicile beyond the limits of the territory from which he was elected or appointed, he shall have vacated his office.

The "territory from which he was elected" necessarily means the geographic location from which respondent received the requisite number of votes to obtain his judicial office, i.e., the 1st division of the 63rd District Court. [25] Additionally,

---

[24] Code of Judicial Conduct, Canon 1 states:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary. . . .

[25] Respondent argues:

> The territory from which he was elected is the 63rd District. This is one district, with two divisions. MCL 600.8130(4). The fact that it has two divisions does not make it two districts. In fact, the legislature, in creating divisions of a district court, explicitly stated, "The provision for election divisions of a judicial district have no effect on the administration of a judicial district." MCL 600.8102. [Respondent]'s residence at 201 Honey Creek Drive in Ada is undeniably within the 63rd District. He has always maintained his principal residence in one of the divisions of the 63rd District.

Contrary to this argument, respondent does not dispute that he was elected exclusively from votes cast within the 1st *division*. Therefore, it is the 1st division that constitutes the "territory from which he was elected," not the 63rd District. Indeed, as stated by the JTC:

"domicile" is defined as "[t]hat place where a man has his true, fixed, and permanent home and principal establishment and to which, whenever he is absent, he has the intention of returning." Black's Law Dictionary (5th ed). A domicile is "that place where a person has voluntarily fixed his abode not for a mere special or temporary purpose, but with a present intention of making it his home, either permanently or for an indefinite or unlimited length of time." *Henry v Henry*, 362 Mich 85, 101-102; 106 NW2d 570 (1960) (citation and quotation marks omitted). "One cannot be permanently located in more than one place; one cannot be domiciled in more than 1 place; one cannot intend to remain for an extended period of time in more than 1 place." *In re Scheyer's Estate*, 336 Mich 645, 651-652; 59 NW2d 33 (1953). "Generally, the determination of domicile is a question of fact. However, where, as here, the underlying facts are not in dispute, domicile is a question of law for the court." *Fowler v Auto Club Ins Ass'n*, 254 Mich App 362, 364; 656 NW2d 856 (2002).

Further, MCL 600.8201 requires that "a candidate for and a judge of the district court shall be licensed to practice law in this state and shall be a registered elector of the district and election division in which he seeks to hold office."

---

The sincerity of respondent's proposed broad interpretation of the provision is called into question by his explanation at the hearing that he believed he had to be domiciled within the 1st Division [only] when he was "running" for re-election.

During the master's hearing, respondent testified to the following facts regarding his domicile between 2000 and 2008, which the JTC used in rendering its decision. Respondent stated that from 1984 until 2000 he owned a house on South Monroe Street, within the 1st division, where he purportedly lived until 1999. In 1998, he purchased a home on 201 Honey Creek Avenue in Ada Township, an area outside the 1st division from which he was elected. He claimed that he was not domiciled there until 2005. Respondent testified that the year after he bought the property at 201 Honey Creek, he sold the Monroe Property because he "needed the money," and then moved to his sister's house at 260 Oak Street, within the 1st division, "where I was basically a tenant, and that was in 2000." More specifically, respondent stated, "[W]hen I bought 201 Honey Creek, that was a lot of money for me, and that's why I sold the [Monroe Property] and moved to my sister's house [at 260 Oak Street], who was kind enough not to charge me any rent[.]" Respondent changed his license and voter registration to reflect this move. He claimed that he maintained this living arrangement until 2002, when he began renting an apartment located on Thirteen Mile, which was also in the 1st division. Respondent again changed both his driver's license and voting address to his Thirteen Mile property. However, during this time, respondent admits that he spent a "significant" amount of time at 201 Honey Creek and slept there "a lot." In other words, respondent testified that he sold his primary residence in 1999 so he could fix up 201 Honey Creek and live with his sister at no cost until 2002, when he began living at Thirteen Mile.

29

In 2002, respondent purchased another property, 109 Honey Creek, and then purchased yet another property on Belding Road, which is within the 1st division, and as to which he testified, "I bought that in June of, I think 2003, and I didn't move there until early 2004. And I lived at [Thirteen Mile] until I moved in, but it wasn't when I bought it."[26] Respondent changed his voter registration on March 11, 2004, and his driver's license on March 23, 2004, to the Belding Road address. However, he registered his mailing address with the Secretary of State as being the address of the 1st division courthouse. In regard to the period immediately following respondent's purchase of 109 Honey Creek, he testified to the following:

> That house [109 Honey Creek] I had to get done because there was a person that wanted to buy it, and so I was down there a lot and I worked late into the night, and a number of times I just went up and slept at 201 [Honey Creek]. If I didn't work that late, I went back to the Bostwick Lake, Belding Road address.

Respondent stated that Belding Road continued to be his domicile until December, 5 2005, when he moved to 201 Honey Creek, which was further confirmed by his filing of a homestead exemption for 201 Honey Creek in 2006. However, despite admitting that he was domiciled at 201 Honey Creek after 2005, respondent testified that, in 2007, he (a) voted within the 1st division using his

---

[26] Respondent testified that his daughter contributed to purchasing the Belding Road property as an investment but that she never lived there. Additionally, respondent testified that the property was actually an "investment for [him] also, but it's [his] – the place where [he] was living at the time."

Belding Road address,[27] (b) applied for a concealed weapons permit on February 7, 2007, using his Belding Road address,[28] (c) never changed his voter registration to 201 Honey Creek,[29] and (d) never changed his driver's license to the 201 Honey Creek address.[30] He also admitted knowing that he had to change his voter registration and driver's license, and, despite consistently doing so during every move from 2000 to 2005, he failed to do so once he moved to 201 Honey Creek.

From this testimony, respondent expressly admits to moving outside the 1st division to 201 Honey Creek as of 2005. He also admits that he intended for that location to be his domicile. Both of these admissions are reflected in the master's and the JTC's findings of fact. These admissions *alone* are sufficient to demonstrate that respondent moved outside of "the territory from which he was elected," which is a violation of Article 6, § 20 of the constitution. Similarly, the fact that respondent moved outside of the 1st division made him ineligible to be "a

---

[27] The examiner asked respondent: "And [after moving to 201 Honey Creek] you actually voted using your Belding address while you were living in Honey Creek; is that right?" Respondent answered: "Yes."

[28] The examiner asked respondent in regard to his February 7, 2007 concealed weapon permit: "And on that application, you list your Belding address as your primary residence; is that correct?" Respondent answered: "That's correct."

[29] The examiner asked respondent: "You didn't change your voter registration to [201 Honey Creek]; right?" Respondent answered: "No."

[30] The examiner asked respondent: "You didn't change your driver's record or information with the Secretary of State [to 201 Honey Creek] either, did you?" Respondent answered: "No."

registered elector" of that division, regardless of the fact that respondent improperly voted in that division after 2005 in violation of MCL 600.8201. Thus, respondent failed to comply with Article 6, § 20 of the constitution and MCL 600.8201, which is also violative of Canon 2(B) of the Code of Judicial Conduct's requirement that a judge "observe the law," and as a result Canon 1's requirement that a judge maintain the "integrity" of the judiciary." Additionally, respondent's conduct runs afoul of MCR 9.104:

> (A) The following acts or omissions by an attorney,[31] individually or in concert with another person, are misconduct and grounds for discipline, whether or not occurring in the course of an attorney-client relationship:
>
> * * *
>
> (2) conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach[.]

There can be no question that a judge's failure to obey the law, which he has taken an oath to uphold, "exposes the legal profession [and] the courts to obloquy, contempt, censure, or reproach."

### B. Breaching Faith

Beyond acting in dereliction of the law, respondent in a very fundamental sense has broken the bonds with the people of his district. By his own acknowledgement, he has knowingly departed from their political community to

---

[31] Because all elected judges within this state must be licensed attorneys, the court rules governing attorney conduct apply with equal force to judges.

become part of another political community. While there may well be some artificiality to these political communities, and while the economic, social and cultural circumstances of the 2nd division may not be markedly different from those of the 1st division, our system of republican government nonetheless is predicated upon the idea that the "we the people" are entitled, and are obligated, to assert their control over the actions of government through the selection of local representatives. By this process, the people communicate their views concerning the kind of leadership they desire from their public institutions. Particularly in the case of the selection of judges-- persons who do not ordinarily make public policy, and who cannot be considered "representative" officers in the same sense as persons elected to the legislative and executive branches of government-- [32] there

---

[32] See, e.g., *People ex rel Royce v Goodwin*, 22 Mich 496, 499-500 (1871):

> When we consider the nature of [judges'] functions, their independence of local affairs becomes still more apparent. Judges differ from all other public servants in having no representative duties. The judicial department of every civilized government is one of the three co-ordinate parts of the sovereignty which acts for the state in expounding the laws and enactments in which the other departments have acted for the people as legislators and the approvers of legislation. It represents only the law by which the people have, by their proper agents, bound themselves. It cannot, therefore, in any of its duties, be said to serve any county, or circuit, or district. Its services are all performed on behalf of the state, as the sovereignty from which all the law emanates . . . . [T]he only object of having local courts is to bring justice home to the people, but not to have cases decided as the desire of the people might shape the decision.

must be some further rationale for why all judges of our state, with the exception of Supreme Court Justices, are elected by "districts" or "circuits." See Const 1963, art VI, §§ 8, 11, and 16.[33]

At least part of this explanation must certainly be that the people are entitled to select as their judges persons whose sense of values, whose judgment, whose life experiences, are in some sense a function of their roots within that community, persons who have shared in some tangible way the day-to-day trials and tribulations, and influences, of citizens within that community. Although the shared experiences of persons within the 1st and 2nd divisions may not be as dissimilar as those between more geographically far-flung communities, it is

_____

That is, judges are presumed to speak, not on behalf of their constituencies, or on behalf of particular concerns within their constituencies, but only to represent the interests of the law, to speak for the rule of law. This is one reason why the Framers of the United States Constitution did not see the need to provide for the popular election of judges as they did for members of Congress and the President. The people of Michigan have made a different judgment in their constitution.

[33] In addition to the constitutional provisions applicable to this analysis, the Legislature has enacted MCL 168.467f(1), which makes clear that district court judges must also be elected from their respective divisions or districts. MCL 168.467f(1) states:

> Except as otherwise provided in this section, judges of the district court shall be elected in each judicial district and election division of a judicial district at the general election to fill vacancies in office[.]

Thus, regardless of the rationale for *why* the people have chosen to require that district court judges be elected from the district and division in which they will serve, the people have unmistakably decided that such a requirement should exist, and that decision must be respected by the JTC and this Court.

nevertheless an outgrowth of our respect for the integrity of local government, and specifically the people's right and obligation to engage in local self-government, that we must take seriously the matter of a public official who has breached the faith with his community that is required by our constitution by departing from it.

In sum, respondent's acknowledgement that he moved outside of the 1st division after 2005 effectively acknowledged both a violation of the law and constitution, and a breach of faith with the people of his community, both of which threaten "public confidence in the . . . integrity of the judiciary," Canon 2(B), and risk "expos[ing] the courts to obloquy, contempt, censure, or reproach." MCR 9.104(A)(2). Thus, I agree with the JTC that respondent's vacation of his electoral district constitutes judicial misconduct and warrants an imposition of sanctions.

## C. False Testimony

In addition to the period *after* 2005, during which respondent acknowledged moving from, and living outside, the 1st division, the JTC determined, on the basis of telephone logs produced during the master's hearing, that respondent had, in fact, moved outside of his electoral district in 2000, rather than 2005. Specifically, these logs indicated that from 2000 to 2004, respondent provided his 201 Honey Creek telephone number as his exclusive after-hours contact for where he could be reached when police officers needed him to make "probable cause" determinations and issue warrants. Because of a medical situation, respondent was not required to be on call from June of 2004 until sometime in 2005 and, thus, he did not provide an after-hours contact number

35

during that period. Once respondent resumed this responsibility in 2005, he briefly provided the telephone number for the Belding Road property in the 1st division. However, calls to the Belding Road address were forwarded to 201 Honey Creek.[34] From the beginning of 2006 until June of that year, he again provided only his 201 Honey Creek telephone number, and from June of 2006 until the beginning of 2007, respondent provided his Belding Road telephone number with calls again forwarded to 201 Honey Creek. In 2007, respondent resumed providing only his 201 Honey Creek telephone number.

From these logs, the JTC concluded that respondent's consistent listing of 201 Honey Creek as his contact information from 2000 to 2008 showed that he, in fact, lived at 201 Honey Creek beginning in 2000 rather than 2005. On that basis, the JTC concluded that respondent's assertion that he had not moved outside of his district before 2005 evidenced a "lack of candor and honesty," which amounted to "false testimony" regarding his residence during this period.

Although "this Court will generally defer to the JTC's recommendations when they are adequately supported," *In re Haley*, 476 Mich at 189, the JTC's use of these telephone logs is not without its difficulties. Of particular concern is the

---

[34] It appears that respondent provided his Belding Road telephone number in response to a visit from the State Court Administrative Office (SCAO). During this visit, respondent was informed that he was in violation of his responsibility to remain domiciled within the division from which he was elected. It was immediately after this visit that respondent temporarily changed his after-hours contact information to the Belding Road property, with calls forwarded to his home at 201 Honey Creek.

examiner's failure to produce these logs in accordance with the master's discovery order. More specifically, the examiner did not make respondent aware that he was in possession of, and intended to use, these logs until respondent was actually testifying during the master's hearing. Once the examiner began questioning respondent about these documents, respondent's counsel objected that the examiner had not produced these logs and that the master should not allow them to be used for substantive purposes. Agreeing with respondent, the master ruled that these documents could only be used to impeach respondent.

However, during these hearings, the examiner called Donna Gillson-- an employee of the 63rd district Court and an acquaintance of respondent-- to testify, and, on the basis of her personal knowledge, she independently established that respondent had provided her with all the numbers contained in the telephone logs. She also testified that the only reason respondent changed his after-hours telephone contact information to the Belding Road address in 2006 was because the State Court Administrative Office (SCAO) had threatened to notify the JTC that he was living outside of the 1st division.[35] Ms. Gillson then stated that

---

[35] It is also worth noting that, although respondent now admits that he moved outside of the 1st division *after 2005*, it seems likely that he only made this admission based on filing a homestead exemption form in 2006 that listed 201 Honey Creek as his primary residence as of 2005, which made it impossible for him to continue denying that this was his home once he discovered that the JTC was aware of this filing. More specifically, when respondent was confronted by SCAO officials in 2006 about living outside his district, he initially denied living at 201 Honey Creek. When these officials asserted he was not living inside his district, respondent replied "I am too." Shortly thereafter, respondent began

having his calls directed to the Belding Road property with calls forwarded to 201 Honey Creek. He also voted in a county-wide election in 2007 using his *Belding Road* address. The inference that respondent originally attempted to continue misleading SCAO about where he lived *after* 2005 is further supported by the fact that on February 1, 2007 Respondent filled out an application to renew his concealed weapon permit and, in that application, also listed the Belding Road property as his actual residence. The majority, rather than viewing this as additional evidence that respondent was engaging in "a deliberate attempt to deceive officials about his change of address," *ante* at 18 n 30, claims that "the failure to change his address was simply an oversight: respondent did not think to read the form and make any corrections, as he admitted that he did not read the form." The majority's willingness to ignore this "oversight" is especially troubling in view of the fact that the form, which respondent was required to read during his testimony, specifically stated, "I understand that this application is executed under oath and swear or affirm under penalty of law the above answers are true and correct to the best of my knowledge. I understand that intentionally making a false statement on the application is a felony punishable by imprisonment of not more than four years or a fine of not more than $2,500 or both." Given that respondent's signature verifies that he signed this form "under oath" and subject to "penalty of law," the majority's attempt to make light of this falsehood simply because "[a]ll he had to do was sign the permit," *id*., is entirely unpersuasive.

The majority's minimization of respondent's responsibility for reading a sworn document that he signed seems inconsistent with *Rowady v K Mart Corp*, 170 Mich App 54, 60; 428 NW2d 22 (1988), in which then-Judge Weaver joined an opinion stating, "Nor is plaintiff's failure to read the entire agreement before signing it relevant. *It is well established that a person cannot avoid a written contract on the ground that he did not attend to its terms, did not read it, supposed it was different in its terms, or that he believed it to be a matter of mere form.*" (Emphasis added.) This basic proposition has been settled in our caselaw for over a century. See, e.g., *Rory v Continental Ins Co*, 473 Mich 457, 489 n 82; 703 NW2d 23 (2005). For reasons she does not explain, Justice Weaver requires less personal responsibility of an experienced judge to read, understand, and take seriously a legal document to which he swears under oath than she requires of all other citizens of this state with regard to their own written contracts.

That respondent provided a false address two years after he allegedly moved to 201 Honey Creek, strongly suggests that respondent would have continued with his "deliberate effort to deceive officials" about his true address. Yet, rather than sanctioning respondent for his conduct, the majority repeatedly

respondent had his calls forwarded from the Belding Road property to 201 Honey Creek. Significantly, she explained that the reason respondent changed his telephone number back to 201 Honey Creek in 2006 was because his call-forwarding made it impossible for him to receive faxes at his home at 201 Honey Creek. This testimony also lends credence to the JTC's finding that respondent provided false testimony because the examiner asked respondent if he "ever had [his] calls forwarded from one home address to another[.]" In contrast to Ms. Gillson's testimony, respondent replied, "[n]o, not that I know of."

The following day, respondent was again called to testify. During this testimony, respondent stated that he had reviewed the logs. The examiner then went through each number contained in the logs and respondent verified that all the telephone numbers contained therein belonged to him during the listed times. Further, after the JTC rendered its decision, which was based substantially on the logs, respondent challenged the use of those documents in this Court. However, in doing so, respondent made the following statement in his brief:

> Assuming, arguendo, that the duty logs presented were accurate copies of the ones that were created in the ordinary course of business, it should come as no surprise that [respondent] listed a phone number at 201 Honey Creek a place where he could be found when not on the bench. As [respondent] testified, he spent a significant amount of his free time renovating two homes on Honey Creek.

makes excuses on his behalf. I look forward to the majority being similarly empathetic when criminal and civil appellants who are not judges raise the "all I had to do was sign the permit" defense.

Thus, although respondent's challenge to the JTC's use of the telephone logs is framed in "arguendo" terms, he notably does not contest the *validity* of these logs, and indeed admits that it should "come as no surprise" that he listed the 201 Honey Creek number for where he could be contacted after hours.

Because Ms. Gillson testified from her own personal knowledge about the after-hours telephone numbers that respondent had provided, and because respondent later verified all these numbers, respondent can hardly question in good faith the information in the logs that contributed to the JTC's conclusion that respondent had provided false testimony when claiming that he did not move outside of his district before 2005. Thus, despite the examiner's failure to properly produce the telephone logs before the hearing, the information contained in those records nonetheless affords an altogether proper basis from which the JTC could conclude that respondent's testimony was not truthful.

Further, as the examiner initially stated, the logs were intended to impeach respondent in regard to his testimony that he had not moved outside the 1st division before 2005. Although respondent's relocation constituted part of the substantive claim levied against him during the disciplinary proceeding, this same information is also relevant to ascertaining his credibility and, in service of the latter purpose, suggests strongly that respondent was not being truthful, the primary purpose for which the logs were employed. Accordingly, the JTC

properly evaluated these documents in determining that respondent had provided false testimony.

The JTC's conclusion that respondent moved outside the 1st division before 2005 is further supported by Ms. Gillson's testimony that she delivered campaign materials to 201 Honey Creek, where respondent was apparently planning his 2002 re-election campaign.[36] Ms. Gillson stated that she had dropped respondent off at 201 Honey Creek on a number of occasions before 2005, and that she thought it was "fairly well known to everyone where he lives."[37] Because "one cannot be domiciled in more than 1 place, one cannot intend to remain for an extended period of time in more than 1 place," *Scheyer's Estate*, 336 Mich at 651-652, respondent's actions, especially in light of the information he provided to the district court concerning his exclusive after-hours contact number at 201 Honey Creek from 2000-2004, indicate that for an "extended period of time" (2000-2004), he intended to remain at 201 Honey Creek. Thus, respondent was

_____

[36] Respondent also admitted that before 2002 he *"*intended to live [at 201 Honey Creek]. And, frankly, that's why I was working on that. I wasn't working on that to resell it." Although, this statement could be viewed as evidencing respondent's intent to live at 201 Honey Creek at some later date, such an interpretation is substantially undermined by the "significant" amount of time he spent there from 2000 until 2008. It would be disingenuous for respondent, despite admitting to being present at 201 Honey Creek on so frequent a basis, while simultaneously providing an exclusive after-hours contact number at that same address during this time, to now claim that his intention to be domiciled there was directed toward some future date.

[37] During a 2004 incident in which police were summoned to 201 Honey Creek, the officers observed that respondent's pet cat was present at the property.

domiciled outside of the 1st division before 2005, and his testimony to the contrary was not truthful.

Given this evidence, both circumstantial and direct, it is puzzling how the majority, after "having reviewed the entire record closely," can now assert that it does "not find that respondent lied under oath," and that it "agrees with respondent's counsel that this is not a case of arrogance," *ante* at 18, but one of confusion.[38] *Ante* at 18. Specifically, the majority asserts that respondent once more was "confused and could not remember a series of different telephone numbers (until he later refreshed his recollection), specific dates and times, and events that occurred nearly 10 years prior to the date he testified." *Ante* at 19-20. By suggesting that respondent was "confused" when the examiner initially confronted him with the telephone logs, the majority leaves unanswered why this initial confusion had any impact on respondent's *second* day of testimony, i.e., the day *after* he was presented with the telephone logs, especially after respondent

---

[38] To the extent that Justice Weaver believes respondent was "confused" about what the law required of him, i.e., respondent "thought he could live [outside of his] division as long as he was not running for re-election," *ante* at 19, this argument is belied by the record. First, there is no statute or caselaw that even hints at such a proposition, and neither Justice Weaver nor respondent has called anything relevant in this regard to the attention of this Court. Second, and more importantly, respondent's prolonged efforts to hide his living arrangement pre- and post-2005 undermine the credibility of any claim that respondent genuinely believed he could live outside of his district so long as he was not currently "running" for re-election. If respondent genuinely believed this, there would have been little need to engage in such an extensive effort to avoid having his residency detected.

42

admitted that he had reviewed those logs by that time and had confirmed that the numbers contained therein belonged to him. Indeed, the majority seems to recognize that respondent was *not* confused regarding the telephone logs at that point by stating that he was only confused "until he later refreshed his recollection." *Ante* at 20. Nor does the majority so much as attempt to explain how Ms. Gillson's testimony, which directly refutes respondent's claim that he did not live outside of his division prior to 2005, bears any relation to respondent's alleged "confusion" concerning pertinent facts as to the telephone logs. Specifically, the majority overlooks completely Ms. Gillson's testimony that respondent began forwarding his calls to 201 Honey Creek in the first place as part of a deliberate effort to avoid detection by the JTC.

Additionally, by stating that "respondent did not try to deny the fact that he was living in the 2nd division at that time because he thought he could live in that division as long as he was not running for re-election," *ante* at 19, the majority implies that respondent was also confused as to whether he could live outside of his district. By suggesting that respondent was "confused" in this regard, the majority misunderstands what is at issue. Respondent's false testimony pertains to his assertions that he did not live outside of the district from which he was elected before 2005 when, in fact, the evidence shows that he did. That is, respondent's lack of candor has little to do with what the law did or did not require of him.

Perhaps most troubling is the majority's willingness to overlook respondent's lack of candor as being due to his alleged "confusion," when the very

43

nature of his judicial responsibilities include properly ascertaining facts, ensuring accuracy in testimony, and correcting inaccuracies that may arise during fact-finding proceedings. Significantly, respondent had the opportunity to do exactly that when he appealed to this Court, but, instead, he stated that "it should come as no surprise that [he] listed a telephone number at 201 Honey Creek, a place where he could be found when not on the bench," since "he spent a significant amount of his free time" there. Thus, rather than supporting the majority's assertion that respondent was confused, his own statements to this Court suggest strongly to the contrary that he was *not* confused. Indeed, it is unbelievable that a judge of respondent's experience would allow any initial confusion that may have caused the JTC to conclude that he lied under oath to persist and to go uncorrected in his appeal to this Court. Finally, regardless of the majority's claim that respondent was "confused" regarding telephone numbers, dates and times, and prior events, *ante* at 19-20, Ms. Gillson was not, and the substance of her testimony was clear, powerful, and damaging to respondent's credibility.

Therefore, apparently on the sole grounds of respondent's alleged "confusion," and with almost no explanation of how it reaches its result, the majority summarily concludes that respondent has neither violated the Michigan Constitution nor provided false testimony under oath. In this process, the majority gives no credence to the following evidence, and thereby utters not a hint of disapproval, and avoids any sanction, for behavior that calls into question the fundamental integrity of our judiciary: (a) respondent's nearly 10 years of

44

continuously spending "significant" periods of his after-hours time at 201 Honey Creek; (b) respondent's admission that before 2002 he "intended to live at 201 Honey Creek," which is why he was "working on [the property]"; (c) Ms. Gillson's unequivocal statement that it is "fairly well known to everyone where [respondent] lived"; (d) the fact that respondent's pet cat was living at 201 Honey Creek before 2005, as noted in a police report stemming from a 2004 incident; (e) the telephone logs directing police officers to reach respondent at 201 Honey Creek as his *sole* after-hours contact *before* 2005; (f) Ms. Gillson's testimony verifying the information in the telephone logs that respondent's sole after-hours contact before 2005 was 201 Honey Creek; (g) the fact that respondent actually ran his 2002 reelection campaign from 201 Honey Creek; (h) Ms. Gillson's testimony that, shortly after respondent was confronted by SCAO and accused of vacating his office by living outside his district, he purposefully misled SCAO regarding his true residency by manipulating his telephone lines through call forwarding; (i) the telephone logs that support Ms. Gillson's testimony that respondent attempted to avoid having his true residence being detected by forwarding his telephone calls; (j) respondent's untruthful answer in response to whether these telephone logs were ever forwarded from his home in the 1st division to 201 Honey Creek of "no, not that I know of," as if he were unaware of how his own telephone calls were being directed; (k) respondent's initial false statement that "I am too [living in the proper district]" in 2006, despite afterwards admitting that he lived outside his district as of 2005 and thereafter when he was

45

confronted by two SCAO officials who alleged that he had moved outside of his district; (l) respondent's false address that was provided when applying for a gun permit that he stated was true "under oath" and "under penalty of law;" and (m) the master's finding, after personally taking respondent's testimony, that he was "less than truthful" in this testimony, and the JTC's unanimous conclusion that respondent was "lacking in candor" in this same testimony.

In sum, because respondent's testimony and actions demonstrate that he was domiciled at 201 Honey Creek before 2005, I agree with the JTC that respondent was not being truthful when giving his sworn testimony. Thus, respondent's constitutional and statutory violations were of longer duration than he admitted-- effectively constituting a "pattern and practice" of misconduct--, which necessarily means, as the JTC concluded, that he showed "a lack of candor and honesty," which amounted to providing "false testimony" before the master. In addition to vacating his electoral district before and after 2005, this lack of candor independently justifies the imposition of sanctions.

## D. Other Misconduct

The remaining allegation of judicial misconduct concerns respondent's inappropriate conduct directed toward female court employees. The JTC found that respondent engaged in three distinct acts of misconduct. In the first instance, he drew female breasts on a note that was attached to a court file. The drawing was made after a female clerk commented on the revealing dress of a woman who appeared in court. The second event concerned the drawing of a penis on a note

that was attached to a court file. The third instance occurred during a retirement party for an employee at the 2nd division courthouse. While at the party, respondent commented on a university sweatshirt worn by a female clerk employed in the 2nd division. Respondent stated that the woman had "an awfully small chest" for the college indicated on the sweatshirt, and "should have gone to a smaller school like Alma," which would have fit her "small chest better."

Respondent's counsel acknowledged that respondent's conduct was "inappropriate," but contended that it was spontaneous and represented "isolated" incidents from respondent's 36-year career. I agree with counsel, and believe that respondent's conduct warrants, at most, a public censure, consistent with the recommendations of the JTC, and the conclusions of the majority.

## VI. *BROWN* FACTORS

In *In re Haley*, 476 Mich at 195, this Court stated:

> When determining the appropriate sanction, this Court seeks not to punish the judge, but to maintain the integrity of the judicial process and protect the citizenry from corruption and abuse.

Based on respondent's conduct, the JTC has recommended that respondent be removed from office, a recommendation to which this Court will ordinarily defer if the JTC has "adequately articulate[d] the bases for its findings and demonstrate[d] there is a reasonable relationship between such findings and the recommended discipline." *Brown*, 461 Mich at 1292. I believe the JTC's findings and recommendations are supported by the record, and agree that respondent's

47

misconduct warrants removal from office. This is confirmed by my review of the *Brown* factors, see *Brown*, 461 Mich at 1292-1293, as follows:[39]

> (1) Misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct.

The JTC found that this factor "weighs heavily in favor of a severe sanction," because respondent had engaged in "a long pattern of deceit" to hide that he was living outside of the 1st division from 2000 to 2008. I am in agreement with this finding. Respondent moved outside his district in 2000 and continually changed his driver's license and voter's registration to other addresses within the 1st division, and engaged in other actions that served no purpose other than to prevent detection. Further, during a visit from SCAO, respondent was accused of not living within the division from which he was elected. In response, he falsely stated, "I am too." Respondent then changed his telephone number on two separate occasions to his Belding Road property, with calls forwarded to 201 Honey Creek, again to prevent his relocation outside his electoral district from coming to light. It was only after respondent was confronted with a homestead exemption form, which clearly showed that he was living at 201 Honey Creek

---

[39] The JTC stated that "[w]hile [its] conclusion is based on the totality of the circumstances, [it is] primarily motivated by the conduct alleged in Count I [moving outside of the division from which he was elected] of the Complaint and by Respondent's lack of candor and honesty with the master and the Commission." Accordingly, the JTC did not analyze the misconduct set forth in section V(D) in the context of the *Brown* factors. Instead, it stated that "standing alone" such conduct would only "merit a public censure."

after 2005, that he finally admitted he was living outside of his division after 2005. These actions demonstrate a pattern and practice of conduct designed to conceal. I believe that the JTC correctly concluded that this factor weighs in favor of a more severe sanction. I also conclude that respondent's inappropriate drawings and comments, which consisted of three incidents over a 36-year period, cannot be viewed as a part of the same pattern or practice. Therefore, this conduct does not increase the severity of the first *Brown* factor.

> (2) Misconduct on the bench is usually more serious than the same misconduct off the bench.

The JTC correctly found that respondent's conduct occurred off the bench, which suggests that a less severe sanction is appropriate.

> (3) Misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety.

The JTC concluded that respondent's conduct, which calls into question his title to office before 2008, jeopardized every judgment that he has imposed from the bench. This is so, it argues, because, without lawful authority to render judgments, those judgments are at risk of being invalidated.[40] I respectfully

---

[40] Although this argument is not at all frivolous, I believe this Court has generally addressed, and rejected, a similar argument in *People v Russell*, 347 Mich 193, 196-197; 79 NW2d 603, 605 (1956):

> We are not inclined to stop and examine the question of whether such magistrate had authority to hold the office he in fact occupied and to which he had color of authority, but content ourselves with applying the rule that if the magistrate was a *de facto*

49

disagree with this legal conclusion for the reasons stated in *People v Russell*, 347

Mich 193, 196-197; 79 NW2d 603, 605 (1956). I nonetheless agree with the JTC that

this factor militates in favor of a more severe sanction. Although respondent's

decisions may remain valid and binding legal decisions, I do believe that the

*propriety* of these decisions raises legitimate concerns. In particular, I believe that

the losing parties in these decisions-- who above all participants in the legal

process must be genuinely persuaded of the legitimacy and integrity of this

process-- may understandably feel embittered or resentful concerning the

decisions in their own cases.

> (4) Misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does.

For the reasons set forth in the previous factor, I believe that respondent's conduct,

at least in retrospect, did create an appearance of impropriety that weighs in favor

of a more severe sanction. Because it views this factor as largely duplicative of

---

> officer his act in this public matter cannot be attacked in this proceeding nor his title to the office be here passed upon. Upon the high ground of public policy and to prevent a failure of public justice, we follow the salutary rule that while one is in public office, exercising the authority thereof under color of law, we cannot, except in a direct proceeding to test his right to the office, pass upon the question here raised, and besides it would avail defendant nothing because there is no difference between the acts of *de facto* and *de jure* officers, so far as the public interests are concerned. The point is ruled adversely to defendant in *Gildemeister v Lindsay*, 212 Mich 299; 180 NW 633 . . . Even though the law creating a judicial office be declared void the acts of an official thereunder will be upheld as the acts of a *de facto* officer. [Citation and quotation marks omitted.]

the considerations set out in the previous factor, the JTC concludes, and I agree, that this factor does not assist significantly in determining an appropriate sanction.

> (5) Misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated.

Although I acknowledge that respondent's initial false statements in response to the unannounced visit from SCAO officials were made spontaneously, his conduct thereafter, including his continuing efforts to keep his actual residence prior to 2005 from being discovered, demonstrates that he engaged in a prolonged effort to mislead SCAO, the master, the JTC, and this Court about his living arrangements. Therefore, I agree with the JTC's conclusion that respondent's actions to avoid detection were deliberate and ongoing, and warrant the imposition of a more severe sanction.

> (6) Misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery.

The JTC concluded that respondent's lack of authority to hold office impaired the judicial system's ability reach a just result. I respectfully disagree with the JTC with regard to this factor and do not believe that respondent's conduct undermined the ability of the justice system to discover the truth in legal disputes coming before this Court. Indeed, I do not believe his conduct affected the substantive determination of any case or controversy, assuming, as I do, that respondent continued during the period in controversy to act as a responsible judicial decision maker as his record suggests he has done for the past 36 years. That his conduct

51

may have undermined the ability of the public, and the administrative systems of this Court, to identify his misconduct in moving his domicile is a factor that is more appropriately taken into account in the first and fifth factors.

> (7) Misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship.

As concluded by the JTC, this factor does not apply to respondent's conduct, and thus suggests that a more severe sanction should not be imposed.


## VII. SANCTIONS

This Court having promulgated the *Brown* factors, and the JTC having evaluated them in this case, "proper deference" is now required on our part. *Noecker*, 472 Mich at 20 (2005) (Markman, J., concurring). Of foremost significance in determining an appropriate sanction for respondent's particular misconduct are the first and fifth factors. Because respondent engaged in a prolonged and deliberate effort to mislead SCAO, the master, the JTC, and this Court, as described in this opinion, including and especially testifying falsely under oath, I believe the JTC has reasonably concluded that respondent should be removed from office.

Although respondent's 36 years of honorable service on the bench, and his excellent reputation, as evidenced both by statements contained within the record and by his reelection in 2008 after the people of his judicial district had been made

at least partially aware of the circumstances of the JTC investigation, constitute substantial factors in respondent's favor in determining a proportionate sanction, in the final analysis these factors do not, in my judgment, outweigh his serious misconduct in this case. See also *Noecker*, *supra*. As Justice Young offered in his dissent, "some misconduct, such as lying under oath, goes to the very core of the judicial duty[.]" *Ante* at 8. So too, I believe, does respondent's conduct in knowingly vacating his district "go to the very core of the representative duty" in our system of self-government. Accordingly, I agree with Justice Young's dissent in this regard, as well as with the JTC's unanimous recommendation, that respondent be removed from office.

## VIII. CONCLUSION

Pursuant to the JTC's unanimous recommendation, I believe that respondent's misconduct in this case warrants that he be removed from office. In moving outside of the district from which he was elected, respondent violated the law and constitution, he violated the fundamental bond with the people of his district established by our system of republican self-government, and he testified falsely with regard to these actions. For the reasons set forth in this opinion, I would hold that respondent should now be removed from office.

Stephen J. Markman
Maura D. Corrigan

53

STATE OF MICHIGAN

SUPREME COURT

In re Honorable STEVEN R. SERVAAS
Judge, 63rd District Court.

No. 137633

_____

Corrigan, J. (*dissenting*).

I join Justice Markman's dissenting opinion in all respects. I also join parts A and B of Justice Young's dissenting opinion, including the discussion of respondent's untruthful testimony and the conclusion that removal from office is the appropriate sanction for respondent's lying under oath.

I write separately only to observe that respondent advances a far more compelling argument for a due process violation than I have seen in any prior Judicial Tenure Commission (JTC) case. The JTC executive director engaged in unnecessarily harsh tactics when he confronted respondent by surprise and attempted to obtain his resignation by 9:00 a.m. the next day. Although the executive director purported to speak for the JTC during his meeting with respondent, the record does not establish that the JTC approved all of the executive director's tactics. Moreover, an impartial master appointed by this Court conducted a hearing and found the facts in this matter, the JTC's decision is merely a recommendation to this Court, and the ultimate disciplinary decision is rendered by this Court after a de novo review. Thus, I conclude that respondent

has not demonstrated an intolerably high risk of unfairness that is required to establish a due process violation.

In *Withrow v Larkin*, 421 US 35, 47; 95 S Ct 1456; 43 L Ed 2d 712 (1975), the United States Supreme Court held that the combination of investigative and adjudicative functions in a single entity does not necessarily violate due process:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

The Supreme Court explained that it is "very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrate Procedure Act, and it does not violate due process of law." *Id*. at 56. Although the combination of investigative and adjudicative functions does not by itself establish a due process violation, a court may nonetheless determine "from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high." *Id*. at 58.

In *In re Del Rio*, 400 Mich 665; 256 NW2d 727 (1977), this Court followed *Withrow* in holding that the combination of investigative, adjudicative, and

2

disciplinary roles of the JTC did not render it incapable of ensuring due process. This Court emphasized that the JTC's role is limited to submitting its recommendations to this Court, and that this Court alone decides what, if any, disciplinary action should be taken.

> This Court has made a conscious effort to segregate within the Commission the investigative and adjudicative functions. We specifically require under GCR 1963, 932.10, that an independent master be appointed by this Court to preside over the adjudicative process once the Commission files a formal complaint. It is this master who also makes the findings of fact and conclusions of law upon which the Commission makes its recommendation and this Court ultimately bases its decision. Therefore, this Court, like the United States Supreme Court in *Withrow*, *supra*, 58, does not believe that the combination of the investigative and adjudicative roles in the Judicial Tenure Commission creates even a risk that due process guarantees could be violated. [*Id*. at 691.]

In *In re Chrzanowski*, 465 Mich 468, 486-487; 636 NW2d 758 (2001), we followed *Withrow*, *Del Rio*, and other Michigan authorities to hold that the JTC's procedures afforded sufficient due process protections, and we found no special facts or circumstances to suggest an intolerably high risk of unfairness:

> As to the procedures, first, pursuant to MCR 9.207(B)(3), the JTC conducted a preliminary investigation to determine whether respondent's alleged conduct warranted further action. Second, after determining that sufficient evidence of misconduct existed, the JTC filed a formal complaint pursuant to MCR 9.208. Third, a master was appointed, notice was given, and a hearing was then afforded respondent under MCR 9.210(A) and MCR 9.211, with the JTC's executive director serving as prosecutor-examiner under MCR 9.201(6). . . . Finally, the JTC's conclusion that Judge Chrzanowski should be disciplined was ultimately just a recommendation to this Court that we are charged to review de novo pursuant to deciding what discipline, if any, is appropriate. As in *Withrow*, the JTC's investigative and adjudicative procedures are functionally separate; additionally, as distinct from *Withrow*, in which the investigation

and the decision were undertaken by the same Medical Examining Board, here the master, the examiner, and the JTC panel are separate entities.  If the board in *Withrow* did not violate due process rights by investigating, and then adjudicating claims, it can hardly be argued that the JTC's procedures violated due process.  Further, a majority of the members of the JTC are judges, and all the members who ultimately recommend discipline are assumed to be fair and impartial.  We conclude then that there was no actual bias in the JTC's decision.  It had authority to review the master's findings de novo, and reasonably determined, by a preponderance of the evidence, that respondent had in fact made false statements.  We find these procedures adequately separated the JTC's investigative and adjudicative functions.

On the basis of these authorities, I do not find a due process violation in this case.  The JTC followed the very same procedures that we concluded in *Del Rio* and *Chrzanowski* were sufficient to ensure due process.  That is, a master was appointed to find the facts that formed the basis for the JTC's decision, the JTC's decision was only a recommendation to this Court, and this Court bears the ultimate responsibility on its de novo review to decide what, if any, discipline is warranted.

Nonetheless, a close question is presented regarding whether special facts and circumstances created an intolerably high risk of unfairness.  The JTC's executive director confronted respondent without warning in his chambers, accompanied by an armed police escort who surreptitiously recorded the meeting.  The executive director provided respondent with documents alleging misconduct and indicated that he would obtain respondent's interim suspension if he did not resign by 9:00 a.m. the next day.  The executive director also presented a resignation letter that had already been prepared *on respondent's own office*

4

*stationery*.  The executive director represented that he was speaking on behalf of the JTC, stating:

> The Commission is offering you this opportunity to resolve this matter as quickly as possible and not bring any shame, proceedings, accusations of perjury against you.  You can resign immediately.  And immediately means immediately.  I have a letter right here you can sign.  The Commission has said that I can give you until tomorrow morning.  I prefer to take the letter with me right now.

When respondent stated that he would like to talk to someone "who knows this area much better that [sic] I do," the executive director responded, "Yeah.  So here's a letter already prepared for you.  If I have that letter faxed to me — my fax number is on that card that I just gave to you.  If I have that letter faxed to my office by 9 a.m., and I mean by 9 a.m."

Respondent stated that he could not make a decision by then, to which the executive director replied:

> Then I'll be filing the petition for interim suspension tomorrow and you will be suspended in a matter of days.  And a formal complaint will issue with this.  So, this will all . . . .  You're up for election this year.  So, this is all going to become public no later than March.  You'll be off the bench before then.
>
> * * *
>
> You have until tomorrow morning at 9.  And I haven't even touched — I haven't even touched the sexual harassment — the little notes that you draw, the comments you make to the staff.  I mean, we haven't even gotten . . . .  Oh yeah.  We haven't even gotten there.

You may think that because you were born in 19 whatever it was — forty something or other, that you're from an old enough generation that can get away with saying certain things, but it's just not true.

The executive director later repeated that "[i]f the Commission has your letter of resignation by tomorrow by 9 a.m., this matter will be gone. Nobody will hear about it. You'll have a retirement party. Everybody will go home happy." But, the executive director stated, if respondent fought the allegations, "I almost welcome the opportunity. Or you can take the easy way out and take a resignation."

When respondent asked to see a file referred to in one of the alleged sexual drawings that the executive director provided, the executive director stated, "I'm not here now to do any type of interview with you. I'm not here to explain anything else." When respondent asked what other evidence formed the basis for the allegations, the executive director stated:

Sir, I've followed the court rules. The rules are provided in 9.200 and following. We've complied with the court rules. I've come here to personally to [sic] give you this to perhaps avoid any embarrassing situations. I've come here to perhaps avoid having to drag your name through the mud with what is going to come out at a formal hearing and to give you an opportunity to obviate all that and retire quietly. I'm not here to discuss the matter with you.

The executive director later stated, "If we push this all the way, everybody's going to know why you left because you got thrown off the bench."

6

As the above excerpts reflect, the executive director's tactics were unnecessarily harsh. The executive director essentially ambushed respondent in his chambers with the allegations, demanded his immediate resignation by 9:00 a.m. the next day, and refused to answer respondent's questions regarding the bases for the allegations.

The record does not, however, reflect that the JTC itself approved all these tactics. Although the executive director represented that "the Commission" was giving respondent until 9:00 a.m. the next morning to resign, the record does not indicate whether the JTC approved the surprise nature of the confrontation, the refusal to answer respondent's questions, or the abrasive disregard of respondent's request for more time to talk to someone.

I am extremely concerned about the grounds for the JTC's decision to exclude from the record the audio recording of the executive director's confrontation with respondent, because it gives rise to a possible inference of collaboration. Respondent submitted the recording as one of several attachments to his brief in support of his objections to the master's report. The JTC granted the examiner's motion to strike the attachments. The JTC chairperson explained the basis for that decision:

> The presentation of additional evidence after the conclusion of a public hearing as [sic] governed by MCR 9.218. That rule provides that the Commission may order a hearing with at least 14 days' notice. That process was not found [sic] in this case. Accordingly, the motion to strike was hereby granted.

The court rule cited by the chairperson, MCR 9.218, provides:

7

The commission may order a hearing before itself or the master for the taking of additional evidence at any time while the complaint is pending before it. The order must set the time and place of hearing and indicate the matters about which evidence is to be taken. A copy of the order must be sent to the respondent at least 14 days before the hearing.

Regardless whether the striking of the audio recording was a correct decision under MCR 9.218, I have no real evidentiary basis to question the conclusion that the JTC decided the motion on the basis of its stated rationale rather than because of any effort to conceal the audio recording.

Therefore, I conclude that the executive director's punitive tactics alone do not rise to the level of special facts or circumstances that would create an intolerably high risk of unfairness. The record does not show that the JTC members exhibited any bias or prejudgment, and respondent has not overcome the presumption of honesty and integrity in those serving as adjudicators. *Withrow*, *supra* at 47. Moreover, an impartial master appointed by this Court conducted the hearing and found the relevant facts, the JTC's decision was merely a recommendation to this Court, and it is this Court, after the de novo review, that now renders a decision regarding the appropriate discipline, if any, that should be imposed. *Del Rio*, *supra*; *Chrzanowski*, *supra*.

Accordingly, despite my serious concerns regarding the executive director's behavior during his confrontation with respondent, I am not convinced that respondent has established a violation of his due process rights.

Maura D. Corrigan

8

# STATE OF MICHIGAN

## SUPREME COURT

In re Honorable STEVEN R. SERVAAS
Judge, 63rd District Court.                              No. 137633

---

Young, J. (*dissenting*).

I join in parts V(A) and (C) of Justice Markman's opinion. Like Justice Markman and the Judicial Tenure Commission (JTC), I conclude that respondent lied during the JTC proceedings and that this misconduct alone provides sufficient basis for removing him from office.[1] I write separately because I decline to address whether the JTC has the authority to determine if respondent vacated his office in violation of Const 1963, art 6, § 20 during the course of judicial disciplinary proceedings because respondent *admitted* that he changed his primary residence from the first to the second election division from August 2005 to February 2008. Given respondent's admission that he moved outside his election

---

[1] I am aware of the behavior exhibited by the executive director of the Judicial Tenure Commission in January 2008. However, the propriety of his actions is best addressed by the Attorney Grievance Commission, and is not before the Court today. Rather, the sole issue before the Court is whether respondent's actions constitute judicial misconduct.

division,[2] I believe that a formal determination of the JTC's power to decide such a question independent of respondent's admission is unnecessary in this case and do not reach a conclusion in the question debated by Justices Markman and Weaver in their respective opinions.

## A. Respondent lied under oath

I fully agree with Justice Markman's analysis of the record in parts V(A) and (C) regarding respondent's untruthful testimony. What is startling is that the majority accepts without question respondent's proffered justification for vacating his office—that respondent "thought he could live in [the second election] division as long as he was not running for re-election."[3] Were this justification true, one would have expected respondent to live openly and notoriously at his legal residence, wherever that residence happened to be located within the 63rd District. However, review of the record reveals quite the opposite—respondent's actions

---

[2] I believe that respondent's admission establishes that he violated Const 1963, art 6, § 20. Because the law forbids abandonment of office while the office holder continues to function in that office, it is sanctionable judicial misconduct for any judge to continue serving in an office that he has vacated. However, in light of my conclusion that respondent lied under oath, and that this misconduct alone warrants his removal, I do not believe it necessary to address the appropriate sanction for either the abandonment of office violation or the sexually inappropriate misconduct that the JTC also concluded respondent committed.

[3] *Ante* at 19. However, respondent asserted in his brief yet a different justification in his brief, claiming that he was "only required to live within the *district* in which the court sits" and could "make his principal residence in any *division* within that *district*." (Emphasis in original.)

during the relevant period were completely inconsistent with one who *honestly* believed that he could freely live outside his election territory.

Respondent acknowledged that he moved his legal residence out of the 1st election division in 2005. Significantly, respondent acknowledged that he knew that he was required by law to change his address after he moved. However, respondent never changed the address on his driver's license to reflect his move to the second election division.[4] Additionally, despite acknowledging that he was legally required to do so, respondent never changed his voter registration information from the first to the second election division. In fact, respondent fraudulently continued to vote *as though he still lived* in the 1st election division.[5]

Moreover, respondent continued to list his 1st election division address as his "residential address" on his 2007 application to carry a concealed weapon

---

[4] The law requires a person to "*immediately* notify the secretary of state of his or her new residence address," and the failure to do so is punishable by a civil infraction. MCL 257.315(1), (3) (emphasis added).

[5] Voting in a district other than that associated with one's place of residence is prohibited by law. MCL 168.932a(d). Nevertheless, respondent claimed that he was entitled to vote in a district where he did not reside because he owned a house in the first election division and "paid the taxes." However, as our constitution provides, and any voting citizen in this state well knows, an elector is qualified by meeting the "requirements of local residence," not simply by paying taxes. Const 1963, art 2, § 1. Moreover, "residence" is defined at MCL 168.11 as the "place at which a person habitually sleeps, keeps his or her personal effects and has a regular place of lodging." At the time respondent fraudulently voted in the first election division, respondent testified that his property in the first election division was occupied and leased to a "guy who wants to buy it." I find that respondent's continued voting in his former electoral district after admitting that he had changed his legal residence *entirely* undermines his credibility and defense.

3

(CCW).[6]  This latter act is particularly egregious because the CCW application is

an affidavit that states:

> Read the following statements and, if you agree, sign below at the time of submission with the clerk.
>
> * * *
>
> I understand that this application is executed under oath and swear or affirm under penalty of law that the above answers are true and correct to the best of my knowledge.  I understand that intentionally making a false statement is a felony punishable by imprisonment for not more than 4 years or a fine of not more than $2500, or both.

Consequently, by signing this application with the incorrect address of residence,

respondent *again* lied under oath.  Despite this, respondent's defense is that he did

not read the application before signing it.  This has *never* been a valid defense to

false swearing on a document requiring an attestation of truthfulness.[7]  The

majority's acceptance of respondent's excuse is as shameful as respondent's

attempt to minimize the consequence of his dishonesty.  We judges demand more

of ordinary citizens who appear before us in court.  Thus, it is hard to understand

---

[6] In addition to being a falsehood, this act is prohibited by law. MCL 28.425b(3).

[7] In fact, the "I didn't read it" defense is not as a cognizable defense for *any* written document in Michigan, much less a document requiring an *attestation of truthfulness*.  See *Otto Baedeker & Associates, Inc v Hamtramck State Bank*, 257 Mich 435; 241 NW 249 (1932); *Int'l Transportation Ass'n v Bylenga*, 254 Mich 236; 236 NW 771 (1931); *Collier v Stebbins*, 236 Mich 147; 210 NW 264 (1926); *Gardner v Johnson*, 236 Mich 258, 210 NW 295 (1926).

the "free pass" the majority has given a fellow member of the judiciary who ought to be held to *at least* the standard of honesty we require of others.

Respondent's intentional violation of the laws governing voting, driver's licenses, and CCW licensing are independently troubling, not inadvertent, and form a pattern of intentional misdirection. If respondent *truly* believed that he was free to live in the second election division, then why would he take such great pains to make it appear as though his legal residence was still in the 1st election division? I think the answer is clear. Respondent took pains to conceal his true residence because he had reason to know that he was *not* living in the proper election division. After respondent filed a homestead exemption for his second election division home in 2005, it became increasingly impossible for respondent to maintain the lie regarding his legal residence being outside his election division.

Additionally, the testimony indicated that between 2000 and the end of 2004 respondent provided court staff with a telephone number to his property in the second election division for the court's after-hour duty log.[8] However, beginning in January 2005, respondent provided a telephone number to his property in the 1st election division, but the testimony indicated that calls placed to this number were *forwarded* to his address in the second election division. Beginning in January 2006, testimony indicated that the after-hours telephone

---

[8] The logs, prepared in three-month intervals, provided law enforcement a means of contacting a member of the 63rd District judiciary after regular business hours.

number was changed to a telephone number in the second election division because respondent "was having problems with his fax machine and he thought that the call forwarding from the other phone was the problem with the fax machine." However, in July 2006, respondent again reverted to providing court staff with a 1st election division telephone number that was again forwarded to his telephone in the 2nd election division. While the testimony indicated that respondent provided the telephone numbers to the court administrator, at the hearing respondent claimed that the telephone numbers "didn't come from [him]" and claimed to be unable to recognize his own telephone number, despite the fact that the telephone number was provided to the court administrator *a mere eighteen months* before the hearing.[9] When asked if he had ever had calls forwarded from one address to another, respondent evasively answered "no, not that I know of." I reject the ridiculous notion that respondent could not recognize his own telephone

---

[9] Because of his need to maintain the deception about the place of his legal residence, even small things became problematic for respondent to admit. He was extraordinarily evasive in his testimony before the JTC. I offer the following example of respondent's evasive testimony:

> *Q*: So it's July, August, September 2006.
> *A*: Right.
> *Q*: With a phone number that's listed there that ends in a 30 that you've read. Do you recognize that phone number as one of your home phone numbers?
> *A*: No.
> *Q*: You don't know what that phone number is?
> *A*: I don't – I mean I'm not saying it isn't, but I – and I don't know how it got there, because I didn't give it to anybody.

number and did not "know" whether he had forwarded telephone calls from one property to the other. More fundamentally, if respondent *truly* believed that he was free to live legally in the second election division and maintain his judicial office, there would have been no need to forward his telephone calls *at all*. Thus, I completely agree with Justice Markman that the record establishes that respondent repeatedly lied under oath. The majority incredulously claims that "respondent did *nothing* to hide the fact" that respondent resided in his second election division home from 2005; however, the plain facts contained in the record indicate otherwise.[10]

## B. Sanction

Having determined that the record fully supports that respondent lied under oath, I believe that the only appropriate sanction is removal from office.[11] As I noted in *In re Noecker*:[12]

---

[10] The majority cites as conclusive evidence the fact that respondent was listed in the local telephone book as proving he "did nothing to hide the fact" that he resided in the second election division. However, a listing in the telephone book merely indicates that respondent had *an* address and telephone number in the second election division. A listing in the telephone book does not indicate one's legal residence. One's voter registration and driver's license *are* indicative of legal residence and, as stated, these indicia do not support respondent or the majority's position. Let us not forget that respondent affirmatively *attested* to the incorrect residence address on his 2007 CCW license application.

[11] This Court has generally removed a judge from office when it has been determined, in whole or in part, that a judge has provided false testimony or evidence in JTC proceedings. See *In re Ryman*, 394 Mich 637, 232 NW2d 178 (1975); *In re Loyd*, 424 Mich 514; 384 NW2d 9 (1986); *In re Ferrara*, 458 Mich 350, 372; 582 NW2d 817 (1998) ("Judges, occupying the watchtower of our

7

The purpose of Judicial Tenure Commission proceedings is not the punishment of the judge, but to maintain the integrity of the judicial process and to protect the citizenry from corruption and abuse. As such, this Court's primary concern in determining the appropriate sanction is to restore and maintain the dignity and impartiality of the judiciary and to protect the public.

* * *

Our judicial system has long recognized the sanctity and importance of the oath. An oath is a significant act, establishing that the oath taker promises to be truthful. As the "focal point of the administration of justice," a judge is entrusted by the public and has the responsibility to seek truth and justice by evaluating the testimony given under oath. When a judge lies under oath, he or she has failed to internalize one of the central standards of justice and *becomes unfit to sit in judgment of others. . . .* [S]ome misconduct, such as lying under oath, goes to the very core of judicial duty and *demonstrates the lack of character of such a person to be entrusted with judicial privilege.*[13]

For these reasons, I would adopt the recommendation of the JTC and remove respondent from office.

Robert P. Young, Jr.

---

system of justice, should preserve, if not uplift, the standard of truth, not trample it underfoot or hide in its shady recesses. This is precisely why judges should be exemplars of respectful, forthright, and appropriate conduct."); *In re Noecker*, 472 Mich 1; 691 NW2d 440 (2005); *In re Nettles-Nickerson*, 481 Mich 321; 750 NW2d 560 (2008). The only exception I can discern is *In re Thompson*, 470 Mich 1347 (2004), where the JTC and respondent reached a plea agreement for a 90-day suspension, and the complaint included an allegation that respondent "demonstrated a lack of candor" before the JTC.

[12] 472 Mich 1, 691 NW2d 440 (2005).

[13] *Id*. at 16-17 (emphasis added).